RICHARDSON et al. v. BERMUDA LAND & LIVE STOCK CO. (No. 218–3343.)

(Commission of Appeals of Texas, Section A. June 1, 1921.)

1. Corporations ⟐382—Note held not in violation of prohibition of use of corporation's funds for other than legitimate object of its creation.

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 1164, providing that no corporation shall employ or use its stock, means, assets, or other property for any other purpose than to accomplish the legitimate objects of its creation, the execution of a note by a land and live stock company to pay a railroad contractor a certain sum upon the completion of a railroad line adjacent to the company's land was within the power of the corporation.

2. Corporations ⟐464—Note held not within prohibition of creation of indebtedness by corporation.

A note by a land and live stock company to pay a certain sum on the completion of a railroad line adjacent to its land, being so conditioned as to prevent the use of its means or assets, until the facilities contracted for were delivered, was not within the prohibition of Vernon's Sayles' Ann. Civ. St. 1914, art. 1165, of the creation of any indebtedness by a corporation except for money paid, labor done, or property actually received.

Appeal from Court of Civil Appeals of Fourth Supreme Judicial District.

Suit by Mary I. Richardson and another, executors of Asher Richardson, against the Bermuda Land & Live Stock Company. From a judgment of the Court of Civil Appeals affirming a judgment in favor of the defendant (210 S. W. 746), plaintiffs appeal. Reversed and remanded for trial on merits.

Denman, Franklin & McGown and Frank S. Huson, all of San Antonio, for appellants.

Alex C. Bullitt, of San Antonio, for appellee.

TAYLOR, P. J. A contract executed October 5, 1908, by the Bermuda Land & Live Stock Company, defendant in error, of which

the following is a copy, forms the basis of the controversy involved in this suit:

"Whereas, we own the following described land, the same being situated in Dimmit county, Texas, known as survey No. ———; and whereas, said land will be greatly enhanced in value by the construction of a standard gauge railroad from a point on the I. & G. N. Railroad now in operation, into Dimmit county, Texas: Therefore, for value received, and as an inducement to Asher Richardson and his associates, and their assigns, to build a standard gauge railroad from a point on the I. & G. N. Railroad near Artesia to Asherton, on Moro creek, in Dimmit county, I, or we, agree and promise to pay to Asher Richardson and his associates at San Antonio, Texas, the sum of two thousand dollars, with eight per cent. (8%) interest per annum from maturity until paid.

"Said sum of two thousand dollars to become due and payable upon the completion of said railroad to Asherton and putting the same in operation, providing same is done on or before June 1, 1909.

"Should this note not be paid at maturity and suit is brought to collect same, then I agree to pay an additional 10% as attorney's fees."

Suit was filed on the contract by Asher Richardson. Subsequent to his death it has been prosecuted by Mary I. Richardson and Littleton V. Richardson, independent executors of his estate, and plaintiffs in error here.

The following is a summary of the allegations of the petition material to this discussion: Defendant in error, Bermuda Land & Live Stock Company, is a corporation chartered for the purpose of buying, selling, and raising live stock, and has the power to hold, purchase, sell, mortgage or otherwise convey such real and personal estate as the purposes of the corporation require. In conducting its business it owns and operates a large pasture in Dimmit county, Tex., in which there were no railroad facilities prior to the building of the railroad referred to in the contract. The pasture was 25 or 30 miles from the nearest railroad. Defendant in error executed the contract sued on as an inducement to Richardson to build the road next to its land. This railroad was the first to enter Dimmit county. It extends from Asherton to Artesia, a distance of 30 miles or more, passing next to defendant in error's land, affording it a valuable means of transportation. Defendant in error believed that the railroad would tend to greatly increase its business and the value of its land, and its purpose in executing the contract was to increase its corporate business and the value of its land. Richardson built the railroad and put it in operation within the time agreed upon, and by reason thereof defendant in error was provided with a means of transportation which has greatly increased its business. The increased value of its business, as well as the increase in the value of land resulting from the building of the railroad, is far in excess of the amount of the note

sued on. The sum agreed in said contract to be paid was reasonable as an expenditure for the benefits received, and was an ordinary, usual, and customary expenditure for such a corporation, under the circumstances, to obtain such facilities. The note is past due and unpaid.

The trial court sustained a general demurrer and special exception. The ground of the exception was that the petition shows that the defendant in error is a private corporation organized under the laws of Texas, and does not show that the contract sued on was executed to evidence an indebtedness created for money paid, labor done, or property actually received.

The Court of Civil Appeals affirmed the judgment of the trial court under the view that it was not within the power of defendant in error to execute the contract sued on; that the contract was ultra vires and void, and defendant in error was not estopped from setting up its invalidity. 210 S. W. 746.

[1] The provisions of articles 1164 and 1165 (Ver. Sayl. R. S. 1914) are made the basis of the court's holding that defendant in error was without authority to make the contract. The former provides that no corporation "shall employ or use its stock, means, assets, or other property, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation * * * "; the latter, that no corporation "shall create any indebtedness whatever except for money paid, labor done, * * * or property actually received."

The provisions of article 1164 are identical with the provisions of article 665 of the Revised Statutes of 1895, and article 589 of the prior revision. It is clear from the opinions of the Supreme Court construing its provisions as contained in the former statutes that the execution of the contract sued on was not in violation of such provisions. Northside Ry. Co. et al. v. Worthington, 88 Tex. 562, 30 S. W. 1055, 53 Am. St. Rep. 778; Bond v. Terrell Mfg. Co., 82 Tex. 309, 18 S. W. 691; Commanche Cotton Oil Co. v. Browne, 99 Tex. 660, 92 S. W. 450; Ft. Worth City Co. v. Smith Bridge Co., 151 U. S. 294, 14 Sup. Ct. 339, 38 L. Ed. 167. It can hardly be questioned that the expenditure of a reasonable amount by defendant in error for the purpose of securing such improved transportation facilities to and from its land as would greatly increase its business was an expenditure to accomplish, and aid directly in accomplishing, the objects for which it was created.

[2] The more serious question in the case is whether the execution of the contract sued upon was in violation of that provision of article 1165 relating to the character of indebtedness that a corporation is prohibited from creating.

Articles 1164 and 1165 were taken by the 1911 codifiers of the statutes from chapter 166 of the General Laws passed in 1907 at the regular session of the Thirtieth Legislature. Laws of Texas, vol. 13, p. 309. That part of section 5 of the act from which the articles referred to were carved, is as follows:

"No corporation, domestic or foreign, doing business in the state, shall employ or use its stock, means, assets or other property, directly or indirectly, for any other purpose whatever than to accomplish the legitimate objects of its creation or that permitted by law, nor shall it issue any stock or create any indebtedness whatever except for money paid, labor done, which is reasonably worth at least the sum at which it was taken by · the corporation; or property actually received reasonably worth at least the sum at which it was taken by the company."

The remaining part of section 5 contains provisions forbidding such corporation to use its assets, property, stock, means, or funds, in the interest of any political party or candidate for office, etc., and provides a penalty for the violation of any of the provisions of the section.

The caption of the act in full is as follows:

"An act on the subject of private corporations, prescribing the terms and conditions on which they may be chartered, and providing the amount of capital stock to be paid in, and when the remainder shall be paid; also prescribing the method by which the capital stock of private corporations may be increased and decreased; also providing for the dissolution of corporations, and the procedure incident thereto; also forbidding any such corporation to use its assets, property, stock, means or funds in the interest or for the success of any political party or candidate for office, or for the defeat or success of any questions submitted to a vote of the people, or for any purpose other than to accomplish the legitimate objects of its creation."

The other sections of the act are not pertinent.

The caption, in so far as it is material here, declares that the purpose of the act was to forbid any such corporation to use its assets, property, means, or funds for any purpose other than to accomplish the legitimate objects of its creation. It suggests no further restriction on the powers of the corporation in this connection than that stated. The first four lines of section 5, brought forward in the 1911 revision as article 1164, makes effective the declared purpose of the act in almost the identical language of the caption.

That part of section 5, quoted above, not incorporated in article 1164, was brought forward in the revision as article 1165. It appears in general to be a legislative enactment of section 6 of article 12 of the Constitution, which declares that—

"No corporation shall issue stock or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void."

Unless the indebtedness referred to in article 1165 was a general term used by the Legislature to include stock and bonds and such evidences of indebtedness as should constitute the capital of a corporation, it is a distinct limitation upon article 1164. It is questionable whether the Legislature intended by the act of 1907 to place any further limitation upon the use by a corporation of its means or funds than that stated in article 1164, and in the caption of the act. It is not necessary, however, under our view of the effect of the contract declared upon, and in view of the allegations of plaintiffs in error, to construe the act further than to determine whether the contract comes within the terms of that provision relating to the creation by a corporation of "any indebtedness whatever," brought forward as article 1165.

What the Bermuda Land & Live Stock Company did, as appears from the allegations, was to enter into a contract with Richardson and his associates for the purpose of securing transportation facilities to be so used in the conduct of its business as to directly promote the purpose for which it was created. The contract was so conditioned as to render it impossible for the means or assets of the company to be used pursuant to its terms for any purpose until the facilities contracted for were delivered. The company did not, by the execution and delivery of the contract, lend its credit to plaintiffs in error. By the terms of the contract no indebtedness was created against the company until the transportation facilities were available to it for use. The promise to pay did not mature into an indebtedness and become payable except upon the "completion of said railroad to Asherton and putting the same in operation." A purchaser of the contract would have acquired it at his peril. The promise to pay did not become a binding obligation against the company until that which was to be received by it had been actually received. If the contract executed is within the prohibition of article 1165, a corporation is without power to purchase on its credit. There is, in our opinion, nothing in that part of the act of 1907 quoted above, the effect of which was to prohibit defendant in error from entering into the contract declared upon. H. & T. C. Ry. Co. v. Diamond Press Brick Co., 222 S. W. 204.

In the case cited the brick company, a corporation authorized to manufacture and sell brick, entered into a contract with the railway company, agreeing to hold it harmless from all damages it might suffer by reason of its constructing a spur track to the brick company's plant The railway company built the track as agreed. Judgment was recovered against the railway for personal in-

juries sustained by him at a crossing over the spur track. The railway company sued the brick company on its contract of indemnity for the amount it was compelled to pay under the judgment. The brick company pleaded that the contract was ultra vires, and the trial court sustained demurrers to the railway's petition. It was stated in the opinion that—

"A corporation is empowered to enter into a contract to enable it to carry on the business and accomplish the purpose of its existence, unless prohibited by law or the provision of its charter. The language of the agreement now under consideration leaves no room to doubt that the contract was made in order to accomplish the purpose for which the corporation was created."

In view of our conclusion that the contract sued on does not represent a form of indebtedness prohibited by article 1165, it is not necessary to determine whether the contract benefits received by defendant in error under the contract were "property actually received."

The trial court and Court of Civil Appeals erred, in our opinion, in holding that the general demurrer and special exceptions should have been sustained.

We recommend that the judgments of both courts be reversed, and that the cause be remanded for trial on its merits.

PHILLIPS, C. J. The judgment recommended in the report of the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court.

We approve the holding of the Commission of Appeals on the question discussed in its opinion.