KIDD–SCRUGGS CO. et al. v. TYLER HOTEL CO. (No. 2988.)

(Court of Civil Appeals of Texas. Texarkana. Feb. 19, 1925. Rehearing Denied March 19, 1925.)

1. Contracts ⬅➔261(3)—Default of one party entitled other party to rescind as matter of law.

Default of owner to pay agreed installments entitles contractor, as matter of law,

to rescind, notwithstanding contract in terms gives no such right.

2. Contracts ⬅➔317—Party breaching contract cannot demand performance by other without showing waiver of right of rescission.

Party breaching contract cannot demand performance by other without showing latter's waiver of right of rescission.

3. Contracts ⬅➔280(1)—Loan which defaulting owner agreed to "secure" by certain date, in consideration of which contractor agreed to resume operations, held not secured at date fixed therefor.

Loan which defaulting owner agreed to secure by certain date, in consideration of which contractor agreed to resume building operations, held not secured at date fixed therefor, where, on that date, there was only an agreement to make the loan upon conditions which might or might not be complied with; the verb "secure," as used, meaning to make certain, assure, guarantee, to take hold or possession of, to make one's self master of, obtain, gain.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Secure.]

4. Estoppel ⬅➔63—Contractor held not estopped from asserting owner's failure to procure loan at time agreed as condition to his resumption of building operation.

Contractor, who had agreed to resume building operations if hotel company secured loan on or before certain date, held not estopped to assert failure of company to secure loan at agreed time, by his expressions of pleasure when informed of progress of negotiations for loan; the company not having been thereby induced to do anything to its injury.

5. Principal and surety ⬅➔66(2)—Sureties not liable on contractor's bond for failure to complete work where contractor not liable.

Sureties are not liable on contractor's bond for failure to complete work, where contractor is not liable therefor.

On Motion for Rehearing.

6. Contracts ⬅➔321(1)—Rights possessed by contractor on owner's default in paying cost installments, stated.

On default of owner in paying agreed installments, contractor had right to cease further operations, repudiate contract in its entirety, and sue for damages which had then accrued, or to suspend work and propose terms for resumption of work.

7. Contracts ⬅➔321(1)—Conduct of contractor held sufficient notice to defaulting owner of contractor's refusal to proceed except upon terms proposed.

Continued suspension of work by contractor, and persistent demand for payments due, held sufficient notice to owner of contractor's refusal to proceed further under original contract, except upon terms proposed in resumption agreement.

⬅➔For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**8. Contracts ⬦⟹321(1)—Contractor held not required, on owner's default in payment of agreed installments, to resume work until terms of resumption agreement were complied with.**

Contractor *held* not required, on owner's default in payment of agreed installments, to resume work until terms of agreement to resume building operations, were complied with by owner.

Appeal from District Court, Smith County; J. R. Warren, Judge.

Two suits, consolidated, the first by the Kidd-Scruggs Company against the Tyler Hotel Company and others, and the second by the Tyler Hotel Company against the Kidd-Scruggs Company and others. Judgment for the Hotel Company, and its codefendants, and Kidd-Scruggs Company and others appeal from a portion of the judgment. Reversed and rendered as to portion appealed from; otherwise affirmed.

Burgess, Burgess, Sadler, Chrestman & Brundidge, of Dallas, for appellants.

Marsh & McIlwaine and R. W. Simpson, all of Tyler, for appellee.

HODGES, J. The Tyler Hotel Company is a private corporation organized under the laws of Texas. In September, 1921, it entered into a contract with the Kidd-Scruggs Company, another private corporation, for the construction of a hotel building at Tyler, Tex. By the terms of the construction contract the Kidd-Scruggs Company was to furnish all the labor and material to complete the building for the sum of $226,545. Payment of this amount was to be made as the work progressed, upon estimates furnished by Hill & Co., the supervising architects. A margin of 15 per cent. was to be withheld till the contract was fully performed by the construction company. The contract contained the following provision:

"Should the contractors at any time refuse or neglect to supply a sufficiency of properly skilled workmen, or of materials of proper quality, or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements on its part herein contained, such refusal, neglect or failure being certified by the architects, the owners shall be at liberty, after three days' written notice to the contractors, to provide any such labor or materials, and to deduct the cost thereof from any money then due or thereafter to become due to the contractors under this contract; and if the architects shall certify that such refusal, neglect or failure is sufficient ground for such action, the owners shall also be at liberty to terminate the employment of the contractors for said work, and to enter upon the premises and take possession of all materials thereon, and to employ any other person or persons to finish the work, and to provide the material therefor; and in case of such discontinuance of the employment of the contractors it shall not be entitled to receive any further payment under this contract until the said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the owners in finishing the work, such excess shall be paid by the owners to the contractors," etc.

As a guaranty for the faithful performance of its contract, the Kidd-Scruggs Company, which will hereinafter be referred to as the contractor, executed a bond in the sum of $90,000, with the Fidelity & Deposit Company of Maryland as surety. Among the usual appropriate stipulations, the bond contained the following:

"No change or alteration in the plans, buildings, construction, or method of payment, whether made in writing or otherwise, shall in any way avoid or affect the liability on this bond, and the sureties on this bond shall be limited to such defenses only as the principal of the said bond could make."

In compliance with the contract, the contractor began work on the building in October, 1921. The first, second, and third installments of the contract price, based upon the estimates furnished by the supervising architects rendered in November, December, and January following, were promptly paid upon presentation. These estimates aggregated the sum of $48,410.39. The fourth estimate, calling for $18,031.05, issued February 4, 1922, was not paid in full when presented. However, most of it was paid during the following month. The cause of the inability of the hotel company to meet its payments at maturity was due to the failure of the United States Loan & Investment Company of Dallas to comply with its contract to loan the hotel company the sum of $120,000 to be used in building the hotel. On February 16th, after receiving information from the officers of the hotel company that no funds were on hand with which to meet further payments, the contractor stopped work, but continued to receive shipments of material already purchased. All of its employees were paid off except the foreman and the office men. On February 21st, the managing officer of the contractor wrote the following letter to the hotel company:

"Confirming my statement to you and the directors of the Tyler Hotel Company, we suspended operations of the hotel construction work February 16, 1921. All employees excepting foremen, clerk, and night watchman were paid off in full on the morning of February 17th.

"The employees above referred to have been instructed to remain on the premises, intact, ready to re-employ the men when directed. These men are nonproductive, except while operating with their gangs, and they, together

---
⬦⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

with fixed expenses, are incurring a daily cost of approximately $90.00. Inasmuch as this cost is not the result of our selection, but is one that cannot be avoided, we will look to you to reimburse us for this amount for each day the building remains intact.

"Unless otherwise instructed by you, these organization forces will remain intact. To disrupt the organization force would incur a contingent cost that would necessarily have to be estimated.

"All materials under contract are being permitted to come forward as contracted for. This is being permitted with the understanding that your body is working with the full determination of consummating what you have undertaken. * * * We feel that you appreciate our position and are working with the view of getting us relief at the earliest moment possible. We are doing everything we can to minimize the cost resulting from the shut-down of the building operations, and as soon as same are ultimately determined we will render you an accounting of same. We are anxiously awaiting your instructions and hope they will be received within a very short time."

On February 23d, a conference was held between representatives of the contractor and the directors of the hotel company, without reaching a settlement. Kidd, the representative of the contracting company, on February 28th wrote the directors of the hotel company this letter:

"Pursuant to my statements to your committee February 27th, with reference to our serious condition on the Tyler Hotel building, we have been compelled to release all our foremen and clerk, who are in our direct employ. We have maintained Mr. Drennan, our superintendent, a day and night watchman on the premises. Sullivan & Martyn, the plumbing contractors, are maintaining one of their foremen on the premises. We have been compelled to notify our subcontractors and materialmen of our condition, and we are attaching herewith a copy of our letter sent to them.

"Just what results will now develop is not known. We will necessarily be compelled to advise you later. We have discontinued disbursing the accrued obligations on the building, and will make no further disbursements until we hear from you."

On April 18th, another conference was held between the representatives of the contractor and the directors of the hotel company, which resulted in the making of the following written agreement:

"Whereas, certain persons, firms and corporations, shown by the list hereto attached and marked 'Exhibit A,' have subscribed for the number of shares of the common stock of the Tyler Hotel Company set opposite their respective names; which subscribers have not yet paid the amount so subscribed by them, and said subscribers are now due said Hotel Company on their unpaid subscriptions the amount set opposite their respective names, and

"Whereas, various and sundry persons, firms and corporations, as shown by list hereto attached and marked 'Exhibit B,' have subscribed for 700 shares of the preferred stock of the Tyler Hotel Company of the par value of one hundred dollars per share, and

"Whereas, to the end that Tyler Hotel Company and Kidd-Scruggs Company may settle and adjust the difference between them respecting any claims of the construction company against the hotel company for damages on account of the failure of the hotel company to pay the estimates of the construction company heretofore approved by the architects, it is agreed by said hotel company and said construction company as follows:

"First. The hotel company will use its best efforts to collect the sum of $70,000.00 from the subscribers to its preferred stock, and it will use its best efforts to collect from the subscribers to its common stock the amount due by them respectively as above shown. Out of funds so collected from the preferred and common stockholders the hotel company will apply the sum of $71,667.82 to the completion of its hotel plant now in course of construction in the city of Tyler;' and the balance of the sum over and above said amount of $71,-667.82 collected by it from said stockholders, preferred and common, if any, will be by it turned over to the construction company to be applied by the construction company on claims established against it by subcontractors or others and such other damages that said construction company may sustain, if any, as the result of the delay brought about by the failure of the hotel company to pay the estimates heretofore furnished by the architect to the construction company. * * * (Portions omitted as immaterial.)

"It is expressly agreed and understood that this contract be of no force unless said hotel company secures a loan of $100,000.00 on or before May 1, 1922, from Texas Employers' Liability Insurance Company, or some other source."

After this agreement the hotel company entered into negotiations with the Texas Employers' Liability Insurance Company, which later resulted in securing from that company the loan of $100,000 to be used in the completion of the hotel building. The directors also sold to local citizens in Tyler preferred stock in the hotel company to the amount of $70,000. This stock, however, was subscribed with the understanding that it was not to be paid for till sufficient funds from other sources were secured for the purpose of completing the building. On May 1st the hotel company finished paying to the contractor all that was claimed on prior estimates furnished by the architects. The contractor, however, refused to resume work until it was reimbursed for certain damages claimed as the result of the suspension of the work. On May 9th, the contractor wrote the following to the hotel company:

"This is to advise you that as you did not secure the loan of $100,000.00 on or before May 1, 1922, the agreement between your com-

pany and our company executed the 18th day of April, A. D. 1922, is of no force."

It was further stated in the letter, in substance, that on account of the failure of the hotel company to comply with the terms of the construction contract, the contractor had been compelled to cease active work on the building; that during the intervening time it had done only what in its judgment was necessary to preserve the property as security for the amount the contractor had invested in it; that during the suspension of the work on the building, and since the failure of the hotel company to comply with the agreement of April 18, 1922, conditions had arisen rendering it necessary for the contractor's protection in the matter of its security to incur additional expense to protect from damage the building and material going into it; that it would then require several thousand dollars more money to complete the building than would have been required had there been no suspension of work. It was further stated that the contractor would expect the hotel company to pay such additional costs and expenses as might thereafter be incurred in efforts to protect the building and to remedy any damages which had been occasioned, or that might thereafter result during the suspension of the work, and to protect the contractor against any and all legitimate damages and losses which had already accrued and which might thereafter accrue by reason of the failure of the hotel company to comply with its contract. To this the hotel company two days later replied, stating, in substance, that it expected to carry out in full the construction contract; and reminded the contractor that the loan of $100,000 had been secured, and that the contractor would be expected to resume work. On May 22, 1922, the architects furnished a certificate to the effect that the contractor had refused to resume work on the building, and further certified that such refusal, neglect, and failure on the part of the contractor was sufficient grounds to warrant the hotel company in terminating the employment of the contractor and to authorize the hotel company to take possession of all the material on the premises and complete the building according to the contract. On the same day the hotel company notified the contractor in writing of the receipt of that certificate, stating that it had terminated the contract of employment of the contractor and would, on the 27th of May, 1922, take possession of the building and material, and employ others to complete the construction. That was done at the time stated, and the building was completed for $131,266.15. That sum was $5,888.88 in excess of the contract price.

Prior to that time the Kidd-Scruggs Company had filed a suit against the Tyler Hotel Company and others for the recovery of damages resulting from the breach of the con-

struction contract. It appears that this suit remained upon the docket of the district court of Dallas county without a trial until March, 1924, when it was transferred to the district court of Smith county. After the completion of the building, the hotel company filed a suit in the district court of Smith county against the Kidd-Scruggs Company and the Fidelity & Deposit Company of Maryland, as its surety on its contract on bond, for the recovery of the excess expended in completing the construction of the hotel building. The two cases were consolidated and tried before the court without a jury. The trial resulted in a judgment in favor of the hotel company for the damages sued for, and against the claim of the Kidd-Scruggs Company for the sum claimed in its suit filed in the district court of Dallas county. The appeal is prosecuted by the contractor and its surety from the judgment rendered on the bond. No complaint is here made of that portion of the judgment which denied the contractor's claim for damages.

Both appellants attack the judgment upon the ground that after the default of the hotel company in meeting its payments, the contractor was not legally bound to continue the further performance of the original construction contract. It is insisted that the conditional agreement entered into on April 18th fixed the terms upon which the construction work was to be resumed, and, since the evidence shows conclusively that this agreement never became effective by reason of the failure of the hotel company to secure the loan of $100,000 on or before May 1, 1922, the contractor was within its rights in refusing to proceed under the original contract, and for that reason a judgment should have been rendered for appellants in the trial court. The judgment is further attacked by the surety company upon the ground that the failure of the hotel company to meet its payments when due, thereby causing a suspension of the construction work, constituted a breach which legally justified the contractor in rescinding the original contract and refusing further performance of the construction work; that this right of rescission inured to the benefit of the surety company, and could not be waived or lost by any collateral agreement between the contractor and the hotel company to which the surety was not a party.

[1, 2] Logically the first proposition should be the first discussed, since if it be correct the second need not be considered. It is conceded that the hotel company breached its contract in February, 1922, in failing to meet its payments when due. The evidence shows that similar defaults occurred in meeting payments due in March and April thereafter. These balances existed on April 18th and were not settled in full until May 1st. While the construction contract did not in terms give to either party the right of rescis-

sion upon the default of the other, yet such right would arise as a matter of law. One who has himself breached a contract cannot insist upon performance by the other without showing a waiver of the right of rescission. In this case the agreement of April 18th is relied on as a settlement of all damages resulting from the enforced suspension of construction work, and as a legal waiver on the part of the contractor of its right of rescission.

[3] The issues are then narrowed to this inquiry: Did that agreement ever become effective? The concluding paragraph provides that it was to be of no force unless the hotel company "secured" a loan of $100,000 from some source on or before the 1st day of May, 1922. The trial court found, in effect, that such a loan had been "secured" within the time specified. Appellants insist that the undisputed facts show the contrary. The verb "secure," as here used, is thus defined in the Century Dictionary:

"To make certain; assure; guarantee. (3) Sometimes with *of* as, we were *secured* of his protection. (8) To take hold or possession of; to make one's self master of; obtain; gain; as, to *secure* an estate for a small sum; to *secure* the attention of an audience, to *secure* a hearing at court."

It may be that if within the time limit the hotel company had "made certain" a loan from the Texas Employers' Liability Insurance Company, the loan was, in one sense of the word, "secured," although the borrower had not then obtained possession of the money. The record shows that on April 22d the executive committee of the insurance company held a meeting, the minutes of which contain the following recital:

Messrs. Farnsworth, Morgan and Mitchell reported to the committee that in accordance with their appointment by Mr. Head (the presiding officer) they have gone to the city of Tyler, where they personally investigated property of the Tyler Hotel Company and talked with those interested. Mr. Farnsworth·acted as spokesman for the committee, and voiced 'the judgment of the committee in saying that he thought the property would be ample security for a loan of $100,000.00, and that it would be a successful institution when completed, because of the fact that Tyler needed such hotel facilities very badly. He submitted an amended application from the Tyler Hotel Company, in which they agreed to pay eight per cent. semiannually, to give a guaranty with a surety satisfactory to the association that the hotel would be completed in accordance with plans and specifications of the architect, free from any liens or encumbrances other than for the $100,000.00 to be borrowed, and that the hotel would be furnished and equipped ready for business within eight months from the time we close the transaction with them. It was further agreed that no part of our money loaned to them should be used until they had first used up their own money, approximating $160,000.00 in amount.

"On a motion duly made, seconded and carried the officers were authorized to make the loan subject to the conditions proposed."

It appears from the foregoing excerpt, and other evidence not questioned, that the loan applied for was granted upon the following conditions: (1) A satisfactory bond was to be executed by the hotel company guaranteeing that the building would be completed in accordance with the plans and specifications of the architects, and would be furnished and equipped ready for use within eight months from the close of that transaction; and the property was to be free from any incumbrance except that given to secure the contemplated loan. (2) No part of the money loaned was to be paid to the hotel company until after it had used approximately $160,000 of its own funds in the construction work. (3) An abstract showing a good title to the lot was to be furnished and this approved by the attorney of the insurance company making the loan. (4) The execution and delivery of the necessary papers evidencing the loan and a lien upon the property. None of these details had been fully performed on the 1st day of May, the limit prescribed in the contract of April 18th. The abstract had been delivered, but had not been examined. A lien then existing upon the property had not been released.

With these details unperformed, we do not think it can be said that the loan had been secured. The record shows only an agreement to make a loan upon conditions which might or might not be complied with. A loan upon conditions is not made secure till the performance of those conditions become certain. It is not enough that the 'insurance company had placed itself in a position where the hotel company might later demand the completion of the agreement to make the loan. The contractor had as much right to be assured against a possible default on the part of the hotel company in completing its part of the agreement as against that of the insurance company. Yet in that state of the negotiations·the hotel company might have failed because of its inability to give the bond called for; or it might have failed to collect the remainder of the stock subscriptions required to enable it to invest the $160,-000.00 that must go into the building before any part of the loan would become available. The evidence showed that the building could not be completed by the hotel company without the use of borrowed funds. It was equally plain that the stock subscriptions must be collected before the investment demanded could be made. The hotel company had failed in the past to meet its promises of payment, because of uncompleted loans from another source. It had given no bond, or security other than what the law gave, that future payments would be made at maturity. The contractor was unable to

go on with the construction work without prompt payment of the estimates agreed upon. Suspensions and delays were necessarily expensive and embarrassing to the contractor and its subordinates. Under those conditions it was only reasonable that the contractor should expect that the loan of the needed funds would be made as certain as was practicable in the ordinary course of a business transaction of that character.

The completion of the loan depended upon the action of the hotel company in complying with the very terms it proposed. It had agreed to the time limit, and even if that limit were too short the contractor could not be bound by something to which it had not consented.

[4] Reference is made in the argument of counsel for appellee to testimony tending to show that after the conference with the Texas Employers' Liability Insurance Company, and after the passage of the resolution to make the loan, Kidd, the representative of the contractor, expressed pleasure at the result and urged the representatives of the hotel company to proceed at once to the collection of the preferred stock conditionally subscribed. Those facts are apparently relied upon to show an acquiescence by the contractor in the construction of the April agreement adopted by the court, and to now estop it from saying that the loan was not then secured. Under the facts of this case, the argument is not tenable. The hotel company paid the contractor no money except what it owed the contractor by the terms of the original construction contract. If the subscribers to the preferred stock were willing to take that status of the negotiations as an assurance that the loan would later be made, that was their affair. There is no evidence that they did anything at the suggestion of the contractor, or that they were in the least influenced by its alleged interpretation of the negotiations. But even if it were otherwise, the hotel company was not thereby induced to do anything to its injury. The hotel company did not pay the stock subscriptions; that was done by the subscribers, and they are not, as such, parties in this proceeding.

[5] Since the contractor cannot be held for damages in failing to complete the construction of the building, its surety is not liable. It therefore becomes unnecessary to discuss the second proposition urged in the brief of the appellants.

The judgment will be reversed and judgment here rendered that the Tyler Hotel Company take nothing by its suit against the appellants, and that the latter recover all cost of this suit. Otherwise the judgment will remain undisturbed.

### On Motion for Rehearing.

In this motion for rehearing it is conceded that the failure of the hotel company to meet its payments at maturity was a substantial breach of the building contract, and authorized the contractor to rescind. But, it is insisted, the contractor did not exercise that right, and therefore the original building contract remained in force throughout all the subsequent negotiations, or was in full force at the time demand was made upon the contractor to proceed with the construction work. Upon that proposition the appellee bases an argument that the April agreement is of no importance in determining the rights and liabilities of the parties in this controversy. The April agreement, it is contended, was entered into solely for the purpose of adjusting the damages claimed by the contractor as a result of the enforced suspension of the construction work and arranging for the payment of the overdue installments, and it is immaterial whether it ever became effective or not. We cannot agree to that conclusion. In the original opinion we treated the April agreement as fixing the conditions upon which the contractor was willing to resume operations under the building contract.

[6-8] When the default in paying the February installment occurred, the contractor had a legal right to cease further operations under the building contract, repudiate that contract in its entirety, and sue for the damages which had then accrued. Or he might suspend work and propose terms upon which further performance of the building contract would be resumed and continued. The contractor did cease construction work, and so notified the hotel company, and never thereafter resumed. If the contractor was within its legal rights in thus suspending construction work, when did that right cease? At what state in the negotiations which followed did the duty of resuming work arise? Clearly no such obligation existed on April 18th, when the collateral contract of that date was entered into. At that time three installments were due and unpaid; the damages claimed as a result of the enforced suspension of the construction work were unsettled. The hotel company had made it plain to the contractor that it was without funds and could not pay what was then due, nor could it meet further payments without a loan from an outside source. The continued suspension of work by the contractor, and its persistent demand for payment of what was then due, gave all the notice needed to inform the hotel company that the contractor did not intend to proceed further under the original contract except upon the terms then proposed. At that stage of the negotiations, and in view of the admitted financial condition of the hotel company, the contractor was not required to resume work until the terms agreed to on April 18th had been complied with by the hotel company. By that contract the hotel company was not only to pay what was then due, including

damages, but was to furnish assurance that it could meet future installments when due. The stipulation for securing a loan of $100,-000 could have no other meaning. It was also stipulated that these proposed terms were to be complied with on· or before May 1st following. They were not complied with on that date, and before they were at a later ,date the contractor gave notice of its repudiation of the contract.

The motion for rehearing is overruled.