**COOPER PETROLEUM COMPANY et al.,**
Appellants,

v.

**LaGLORIA OIL & GAS COMPANY,**
Appellee.

**No. 20.**

Court of Civil Appeals of Texas.

Houston (14th Dist.).

Nov. 29, 1967.

Rehearing Denied Jan. 31, 1968.

John A. Croom, Houston, for appellant.

John C. Snodgrass, John B. Holstead, Vinson, Elkins, Weems & Searls, Houston, for appellee.

TUNKS, Chief Justice.

This case involves a suit on two alleged contracts of guaranty, one in writing and the other oral. As to the written contract, it is alleged that Cooper Petroleum Company guaranteed that International Marketing, Inc. would pay to LaGloria Oil & Gas Company the purchase price of certain petroleum products sold by LaGloria Oil & Gas Company to International Marketing, Inc. It is alleged that under the oral contract of guaranty, Albert E. Fagan guaranteed the payment by International Marketing, Inc. to LaGloria Oil & Gas Company of the purchase price of other petroleum products which was the subject matter of other contracts between LaGloria Oil & Gas Company and International Marketing, Inc.

LaGloria Oil & Gas Company is a corporation having its office in Houston, Texas. It is engaged in the refining and sale of petroleum products. Its refinery, from which the petroleum products here involved were delivered, is located at Tyler, Texas. It was the plaintiff in the trial court and is appellee here. It will sometimes be referred to in this opinion as "LaGloria."

Cooper Petroleum Company is a corporation having its office in Houston, Texas. It is engaged in the marketing of petroleum products. It was a defendant in the trial court and is an appellant here. It will sometimes be referred to in this opinion as "Cooper Petroleum."

Albert E. Fagan is president of Cooper Petroleum. He and his wife and children own all of the stock of Cooper Petroleum. He was a defendant in the trial court and is an appellant here.

International Marketing, Inc., was a corporation having its office in Abilene, Texas. It, too, was engaged in the marketing of petroleum products. At times material to the transactions here involved, Fagan, and one James A. Clark, Fagan's son-in-law, owned one-half of the stock of International Marketing, Inc. and the other half of the stock in that corporation was pledged to Fagan to secure a loan made by him to other shareholders. By December, 1963, Fagan had given his share of the stock in that corporation to a son and

another son-in-law. International Marketing, Inc. was not a party to the lawsuit, but it was the buyer of petroleum products under the contract alleged to have been guaranteed by the appellants. It will, in this opinion, be referred to as I.M.I.

James A. Clark is the son-in-law of Albert E. Fagan. He was vice-president of Cooper Petroleum and also vice-president of I.M.I. He was, as above noted, also a shareholder in I.M.I. and received a small salary from it.

In September, 1962, Cooper Petroleum was a party to a contract under the terms of which it agreed to supply aviation gasoline to Slick Airways. The contract was to run for a period of 21 months. Fagan and Clark approached the representatives of LaGloria to request that LaGloria sell, on credit, to I.M.I. the gasoline required by Cooper in this performance of the Slick Airways contract. LaGloria, on September 28, 1962, orally agreed to sell I.M.I. the gasoline on open credit. In the negotiations, Fagan and Clark orally agreed that Cooper Petroleum would guarantee payment of the amounts which became due under this contract. LaGloria requested that Cooper Petroleum's guaranty be reduced to writing and it was agreed that such a writing would be forthcoming.

On November 16, 1962, that oral agreement to sell to I.M.I. was reduced to writing.

In December, 1962, I.M.I. was awarded a contract to supply aviation gasoline to the United States government for a six-month period beginning January 1, 1963. During December, Clark requested of Bruce Jones, general sales manager of LaGloria, that LaGloria furnish I.M.I. the aviation gasoline required by it in the performance of its United States government contract. At that time, Cooper Petroleum had not executed its written guaranty of the first contract. Jones told Clark that LaGloria would again require the guaranty of performance by Cooper Petroleum. Clark assured Jones that such a guaranty would be made and assured him that the guaranty would be reduced to writing in the near future. Under those circumstances, LaGloria agreed to furnish the gasoline required to perform the government contract.

During the month of January, 1963, LaGloria was furnishing to I.M.I. the gasoline required under the terms of the two existing contracts. Cooper Petroleum had not yet executed and delivered its written guaranty. During that month, frequent oral requests were made of Clark that the guaranty be executed and delivered. On February 1, 1963, the guaranty of Cooper Petroleum was reduced to writing. It guaranteed performance by I.M.I. under both of the contracts then in force.

Before July 1, 1963, I.M.I. decided to bid on another United States government supply contract. At I.M.I.'s request LaGloria orally agreed to supply the aviation gasoline which I.M.I. would require in the performance of that second government contract. I.M.I. was successful in its bid and became obligated to deliver to the government during a period of six months, beginning July 1, 1963, more than 5,000,000 gallons of aviation gasoline. Clark had promised LaGloria that Cooper Petroleum would again guarantee the performance of I.M.I. of its contract. On July 1, 1963, in accordance with the terms of its oral contract, LaGloria began supplying I.M.I. with the gasoline required to perform its second government contract. That oral contract was not reduced to writing until July 22, 1963. At that time, the contract between LaGloria and I.M.I. to furnish the gasoline required in the performance of the first United States government contract had expired. I.M.I. fully paid the amounts due under that first government contract.

On September 27, 1963, Cooper Petroleum delivered its new letter of guaranty

which was given in substitution for the one previously executed, dated February 1, 1963. That letter of guaranty was as follows:

"September 27, 1963

LaGloria Oil & Gas Company
P. O. Box 1189
Houston 1, Texas

Gentlemen:

"In consideration of your extention of credit to International Marketing, Inc., with principal place of business located in Abilene, Texas, the undersigned hereby guarantees payment at maturity of whatever amount shall at any time be owing to you on deliveries of products to International Marketing, Inc. under the following contracts between you and International Marketing, Inc.:

"1. Contract designated DSA–63039, pertaining to the approximately 5,-560,000 gallons of aviation gasoline to be delivered to the United States Government.

"2. Letter agreement dated September 28, 1962, pertaining to deliveries of aviation gasoline to Slick Airways.

"This is an absolute and continuing guaranty which is applicable only to transactions under the above cited contract.

Very truly yours,<br>COOPER PETROLEUM COMPANY<br><br>By: /s/ James R. Clark<br>Vice President

Witness: /s/ Gerald G. Arnold
Secretary"

That is the guaranty which is the basis of the present suit against Cooper Petroleum.

On July 22, 1963, I.M.I., by a purchase order confirmed in writing, agreed to purchase from LaGloria 75,000 to 100,000 gallons per month of a product called Lite Alkylate.

On August 1, 1963, LaGloria and I.M.I. entered into another contract under the terms of which LaGloria agreed to sell to I.M.I. 200,000 gallons per month, for a period of two years, of a product known as "100 R.O.N. Gasoline."

In December, 1963, I.M.I. was successful bidder on a third contract to furnish aviation gasoline to the United States government for a period beginning January 1, 1964 and ending June 30, 1964. By a contract dated December 16, 1963, LaGloria agreed to sell to I.M.I. more than 5,000,000 gallons of aviation gasoline to be used by I.M.I. in the performance of its third contract with the United States government.

It is alleged by LaGloria that Fagan, personally, guaranteed payment for the petroleum products sold under these last three contracts. That is the guaranty which is the basis of the suit against Fagan.

In February, 1964, I.M.I. defaulted. It was subsequently adjudicated as bankrupt. At the time of its default, I.M.I. was indebted to LaGloria, under the five contracts then in force, in the amount of $296,311.83.

In the trial court, the jury made findings favorable to the plaintiff, LaGloria. The

trial court rendered judgment for LaGloria against Cooper Petroleum on its writtten guaranty, in the amount of $159,881.90, the balance due from I.M.I. to LaGloria under the Slick Airways contract and the second government contract. The trial court rendered judgment against Fagan, personally, on his oral guaranty, for $136,429.92—the balance due under the July 22, 1963 Lite Alkylate contract, the August 1, 1963 100 R.O.N. contract, and the December, 1963 contract covering the aviation gasoline to be supplied by LaGloria to I.M.I. in its performance of the third government contract.

Some of the points of error presented by the appellants relate to both of them. Those points of error are as follows: (1) the trial court erred in admitting into evidence plaintiff's Exhibit No. 5; (2) I.M.I., the principal obligor, was a necessary and indispensible party to this suit against its guarantors; (3) by its acceptance of a note from I.M.I., representing the amount due on its contracts, LaGloria agreed to a change of the form of the indebtedness and thereby released the guarantors.

Plaintiff's Exhibit No. 5, (the original of which was sent to this court as a part of the Statement of Facts) is a cardboard box containing the records of individual deliveries of petroleum products made by LaGloria to I.M.I. under the terms of the above listed contracts. Plaintiff's witness, Bruce Jones, testified that he was general sales manager of LaGloria and that, while he did not himself personally have custody of the records in plaintiff's Exhibit No. 5 and had not personally made the entries thereon, those working under him did have such personal custody and control and did make the entries thereon. When the Exhibit was offered in evidence, the defendant objected on the ground that Jones had not sufficiently qualified as the custodian of the records so as to be able to identify them in such a manner as to make them admissible as business records under Article 3737e, Vernon's Ann. Tex.Civ.St. That objection was overruled

by the trial court. The overruling of that objection and the admission of the Exhibit into evidence is the subject matter of one of appellants' points of error.

We do not believe that the trial court erred in its ruling. If it was error, though, the error was harmless. Plaintiff's Exhibit No. 4 was admitted in evidence without objection. It was identified as being a compilation of LaGloria's business records showing the deliveries of petroleum products under the contracts in question and the unpaid balances thereon. The facts reflected in Exhibit No. 5 were cumulative of those shown in Exhibit No. 4. In view of the cumbersome bulk of Exhibit No. 5, we feel quite certain that the jury did not examine the many items in it in detail and base its verdict on such examination. Exhibit No. 4, showing the same facts in summary form, constitutes sufficient evidence on which the jury based its verdict as to the deliveries under the contract and the unpaid balances thereon. The error, if any, in admitting Exhibit No. 5 was, under the circumstances, harmless. Mueller v. Central Power & Light Co., Tex.Civ.App., 403 S.W. 2d 901, no writ history; Brown v. Dale, Tex. Civ.App., 395 S.W.2d 677, writ ref., n. r. e.; Rule 434, Texas Rules of Civil Procedure.

The points based upon the proposition that I.M.I. was a necessary and indispensable party to the suit are overruled. The evidence shows that I.M.I. was insolvent and was bankrupt at the time of the suit. Under such circumstances, it was not a necessary nor an indispensable party. Article 1987, V.A.T.S.

On February 27, 1964, LaGloria was informed that I.M.I. was insolvent. On that date, I.M.I. executed and delivered to La-Gloria its promissory note in the amount of $296,311.83, the balance due on its contracts of purchase.

Both appellants contend that LaGloria, by accepting this note, agreed to a change of the form of the indebtedness and accepted the note in payment of the indebtedness on

the contract, thereby releasing the guarantors. Their points of error to that effect are overruled.

◼ The jury found that LaGloria did not accept the note in substitution for the account owed by I.M.I. The sufficiency of the evidence to support this finding is not challenged. There is no challenge here of the form of the issue submitted to the jury making this inquiry.

◼◼ Appellee did not sue Cooper Petroleum and Fagan as guarantors of the note. It sued them as guarantors of the accounts. Since the jury made an unchallenged finding that appellee did not accept the note in substitution for the debts on the contracts of sale, the acceptance of the note did not constitute a novation which would have extinguished the debts under the contract. A novation, which extinguishes an existing debt, arises when the parties intend that the new liability created be given and accepted as a substitute for the existing debt. Frost v. First State Bank & Trust Co. of Mineral Wells (Com.App.), 276 S.W. 222.

Points of error presented in behalf of appellant, Cooper Petroleum, may be summarized as follows: (1) Clark's lack of authority to act in behalf of Cooper Petroleum in executing the letter of guaranty; (2) there was no consideration for the letter of guaranty; (3) the guaranty agreement is unenforceable because it was illegal and ultra vires.

◼ As to the authority of Clark, we find that there is testimony sufficient to sustain the jury's finding to the effect that he had such authority, actual and apparent. He was the son-in-law of Fagan, who, with his family, owned all of the stock in Cooper Petroleum. Clark's testimony on the subject of his authority is equivocal and evasive, but is susceptible of interpretation as evidence that he had authority. There is evidence that Fagan knew of the letters of guaranty (the one dated February 1, 1963,

and one dated September 27, 1967, which letter is the basis of this suit), and never renounced them until after he and Cooper Petroleum had appropriated to themselves practically all of the valuable assets of I. M.I. and after that corporation had defaulted on its contracts with LaGloria. Clark had, with admitted authority, negotiated large contracts as the agent of I.M.I. in which corporation Fagan had substantial financial interests.

◼ We also note that the point of error attacking the jury's findings as to the authority of Clark to execute the letter of guaranty as an authorized agent of Cooper Petroleum is not briefed by appellant. It was, therefore, waived. Thigpen v. Locke (Tex.Sup.Ct.), 363 S.W.2d 247; Hicks v. Hoover, Tex.Civ.App., 410 S.W.2d 534, no writ history; Rule 418 T.R.C.P.

◼ The appellant, Cooper Petroleum, as defendant in the trial court, made a sworn plea of want of consideration. The contract of guaranty, itself being in writing, imported a consideration. Wright v. Robert & St. John Motor Co., 122 Tex. 278, 58 S. W.2d 67. On the issue of want of consideration, Cooper Petroleum, seeking to avoid the written contract, had the burden of proof. Fireman's Fund Ins. Co. v. Abilene Livestock Auction Co., Tex.Civ.App., 391 S.W. 2d 147, writ ref., n. r. e. Cooper did not request submission to the jury of any issue on this defense. Thus, under Rule 279, T.R.C. P., this defense was waived unless want of consideration was conclusively shown.

◼ The argument on behalf of Cooper Petroleum is to the effect that the only consideration given by LaGloria for Cooper Petroleum's making of this contract of guaranty was LaGloria's agreement to extend credit to I.M.I. Since the guaranteed contracts between LaGloria and I.M.I. were already in effect at the time of the execution of the letter of guaranty dated September 27, 1963, Cooper Petroleum contends that LaGloria's promise to extend credit

was a promise to do only that which it was already legally bound to do and was therefore no consideration. That argument ignores the fact that as part of the negotiations, and before LaGloria became bound, Clark, as agent for Cooper Petroleum, made an oral agreement of guaranty. The record shows that in almost all of the transactions involved between these parties, an original oral agreement was made and performance began under the terms of the oral agreement. The oral agreements were subsequently reduced to writing.

Furthermore, on September 27, 1963, the date of the written guaranty, I.M.I. owed to LaGloria between $180,000.00 and $200,-000.00 for gasoline that had been delivered to it. Under such circumstances, LaGloria was not bound to continue to extend credit to I.M.I. Ross v. McLelland, Tex.Civ.App., 281 S.W.2d 773, writ ref., n. r. e.; Kidd-Scruggs Co. v. Tyler Hotel Co., Tex.Civ. App., 270 S.W. 566, err. ref. LaGloria, not being so legally bound, extended its credit in consideration of the guaranty of Cooper Petroleum. That consideration was a valid, lawful consideration. Gulf Liquid Fertilizer Co. v. Titus, 163 Tex. 260, 354 S.W.2d 378. Want of consideration was not conclusively shown by appellant, Cooper Petroleum.

The third line of attack on the judgment of the trial court presented in behalf of Cooper Petroleum, is based upon the contention that its letter of guaranty was illegal and ultra vires.

Cooper Petroleum points out, that since it is a corporation, its letter of guaranty was contrary to the provisions of Article 1349 and 1302–2.06, V.A.T.S. It contends that this renders the contract illegal, void and unenforceable.

We hold that the contract was not, because of its violation of the terms of Articles 1349 and 1302.06, rendered illegal and void. Even before the enactment of those statutes, the courts of Texas recognized that guaranty contracts made by mercantile corporations were ultra vires. The enactment of those statutes was but declaratory of the common law as it existed before their enactment. Richardson v. Bermuda Land & Live Stock Co. (Com.App.), 231 S.W. 337; Bond v. Terrell Cotton & Woolen Mfg. Co., 82 Tex. 309, 18 S.W. 691.

Under Article 2.04(B) of the Texas Business Corporation Act, V.A.T.S., a corporation, itself, is denied the defense of ultra vires when sued on its contract. Inter-Continental Corp. v. Moody, Tex.Civ.App., 411 S.W.2d 578, no writ history; Empire Steel Corp. of Tex. v. Omni Steel Corp., Tex.Civ. App., 378 S.W.2d 905, writ ref., n. r. e.

The points of error of the appellant, Cooper Petroleum, based upon its propositions that its contract was illegal and ultra vires, are overruled.

The points of error urged in behalf of the appellant, Fagan, are as follows: (1) there was no consideration for his guaranty; (2) Clark lacked authority to bind him on the guaranty; and (3) the guaranty is unenforceable under the Statute of Frauds.

As to Fagan's plea of want of consideration, it is to be noted that he, too, failed to request the submission of any issue on want of consideration and has waived that defense unless the evidence conclusively shows that there was a want of consideration.

In December, 1963, while the officials of LaGloria on the one hand, and Clark on the other hand, were negotiating for the sale on credit of the gasoline to be used by I.M.I. in performing its third contract with the United States government, the past due amount owed by I.M.I. under the various contracts then being performed was about $250,000.00. The officials of LaGloria decided that it would be unwise to continue to extend credit to I.M.I. without further security. The September 27, 1963, letter of guaranty from Cooper Petroleum did not cover the liability of I.M.I. under the

contracts relating to the sale by LaGloria to I.M.I. of the Lite Alkylate nor the contract relating to the sale by LaGloria to I.M.I. of the R.O.N. gasoline. It also would not cover the contract then being negotiated. They called on Clark for further security, point-· ing out that their legal department had requested that they have a personal security rather than a corporate security. Clark told them that his father-in-law, Albert E. Fagan, would give them a personal letter of guaranty covering the three contracts not included in the Cooper Petroleum guaranty. LaGloria continued making deliveries and extending credit to I.M.I. As was the case in the earlier promises by Clark to procure the letter of guaranty from Cooper Petroleum, the promised guaranty was not immediately forthcoming. The LaGloria officials, as in their earlier transactions, continued to call on Clark requesting that he procure the letter from Fagan. As was the case in connection with the earlier contracts, LaGloria began making the deliveries in reliance on the promise of Fagan's guaranty and, as on the occasion of the former transactions, Clark continued to promise that the letter of guaranty would be forthcoming. On January 2, 1964, LaGloria sent to Clark a form for the letter of guaranty to be signed by Fagan. When the LaGloria officials called Clark to ask if it had been signed, he, Clark, told them that it had not been because Fagan was out of the city.

Under the authorities hereinabove cited, we hold that the evidence did not conclusively show want of consideration for Fagan's contract of guaranty.

We also overrule the points of error to the effect that Clark did not have authority to bind Fagan on his oral promise of guaranty.

There is evidence to the effect that Fagan knew of the promise made on his behalf by Clark and knew that LaGloria was making deliveries of its products to I.M.I. in reliance on that promise. The sales to I.M.I. were made on credit. Fagan did not communicate to the officials of LaGloria any

denial of the authority of Clark to make that promise. There is evidence from which it could be inferred that he, Fagan, knew that I.M.I. was insolvent and would not be able to pay for the products being delivered to it.

On or about February 1, 1964, some of the pending contracts between LaGloria and I.M.I. were, at the request of Fagan, assigned to Cooper Petroleum. It is true that this was done with the knowledge and consent of LaGloria, but it is also true that it was done without their having been told that I.M.I. was insolvent.

Trans-Texas Transport, Inc., a corporation, was a wholly owned subsidiary of I.M.I. I.M.I. had paid $110,000.00 for its stock. That subsidiary owned the trucks used in delivering the petroleum products for I.M.I. On January 28, 1963, all of the stock in Trans-Texas Transport, Inc. was sold by I.M.I. to Fagan. In a letter from I.M.I. to Fagan reciting the terms of that sale, the recited consideration was stated to be $110,000.00. According to that letter, $11,000.00 of that consideration was paid in cash and the balance of the purchase price was to be represented by Fagan's $99,000.00 note to I.M.I. The letter from I.M.I. to Fagan setting out the terms of the transaction contains the following paragraph:

"It is further agreed that said note shall contain a provision providing that the due date thereof shall be suspended and that it shall not bear interest so long as you or Cooper Petroleum Company are on any guaranty agreement benefiting the undersigned, or so long as either of you is contingently liable on any contract or other obligation of the undersigned, or so long as any debts or claims are owing by the undersigned to either you or Cooper Petroleum."

Soon after Fagan acquired all of the stock of Trans-Texas Transport, Inc., I.M.I. made a payment to it of $9,900.00. If that

payment to his corporation be deducted from the cash payment made by him, Fagan may be considered as having acquired all of the Trans-Texas Transport, Inc. stock, the principal asset of I.M.I., at a cash outlay of $1,100.00.

It was on February 27, 1964, that La-Gloria was told of the insolvency of I.M.I. and by the time of Fagan's renouncement of his guaranty, most of the assets of I.M.I. had been transferred to Fagan or to his corporation, Cooper Petroleum.

■ The jury made findings of fact which we hold were supported by the above stated evidence on the basis of which the trial court properly concluded that Fagan was estopped to deny the authority of Clark to make the promise of guaranty in his behalf and that Clark had apparent authority to make such promises in Fagan's behalf. Wheeler v. White (Tex.Sup.Ct.), 398 S.W. 2d 93; Clark v. Texaco, Inc., Tex.Civ.App., 382 S.W.2d 953, ref., n. r. e.; 2 Tex.Jur.2d 481 and cases cited therein.

We come now to the defense of the Statute of Frauds pled in the trial court by the defendant, Fagan, and by him here urged as support for his contention that the judgment of the trial court against him should be reversed and rendered. The Statute of Frauds, Article 3995, subdivision 2, V.A.T.S., provides in substance that no action shall be brought in any court "to charge any person upon a promise to answer for the debt, default or miscarriage of another;" unless such promise be in writing and signed by the party to be charged therewith or by some person authorized to sign for him.

There can be no question but that the promise of Fagan to answer for the debt of I.M.I. was oral. That promise was made by Clark, a person who, under the findings of the jury, the trial court properly held was authorized to make the promise in behalf of Fagan.

We are here confronted with the question as to whether, under the facts found by the jury and by the trial court, and the other evidence shown in the record, Fagan is precluded from asserting the defense of the Statute of Frauds.

■ The appellee says that the Statute of Frauds defense is not available to Fagan here because the "main purpose" rule is applicable. The main purpose rule was first announced in Texas, in Lemmon v. Box (Tex.Sup.Ct.), 20 Tex. 329. In that opinion the court said: "Wherever the main purpose and object of the promisor is, not to answer for another, but to subserve some purpose of his own, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another." The court also said: "Here the leading object of the plaintiff (as charged in plea) was not to guarantee or to secure the debt of the Carpenters to the defendant, but it was to subserve some purpose of his own."

Since the opinion in Lemmon v. Box (supra), the courts of Texas have on many occasions applied to main purpose rule to cases in which the promisor was sued on his promise to pay the debt of another. The case of Gulf Liquid Fertilizer Co. v. Titus (supra) is one involving the Statute of Frauds defense in such a case. In its opinion in that case, the Supreme Court pointed out that this Statute has given rise to thousands of cases and that no clear, settled rule for its construction has been devised. The court then says, at p. 383 of 354 S.W.2d:

"In reading the cases and the texts, it appears to us that most cases have turned upon *two or more* of the following inquiries which are made to determine whether an oral promise to pay the debt of another is without the Statute and enforceable. They are phrased in dif-

ferent ways by different courts, ,but in substance they are:

"1. Did the promisor intend to create primary responsibility in himself to pay the debt, or did he intend merely to be a surety? The courts may answer this question by saying that the words used in making the oral promise are, themselves, so clear as to be unsusceptible of any other intent than to be, or not to be, only a surety as a matter of law. Or the courts may find that the words are not clear and that the question of intent is one for the finder of fact, taking into account all of the facts and circumstances of the case, including the words used by the promisor. Closely allied with this test is number 3 set out below: was the promise given to subserve some desire of the promisor, or was his purpose merely or only to act as a surety?

"2. Was there consideration for the promise? This inquiry is the same that would be made for any other promise, oral or written. Sufficient consideration is necessary to create a binding contract, generally speaking.

"3. Is the consideration given for the promise the sort of consideration which the courts say is necessary to take the promise out of the Statute? Not all consideration, though sufficient in law, is sufficient for this purpose; and a majority of the courts have applied, in this regard, a rule called the 'main purpose' or 'leading object' rule. This rule places the promise without the Statute, and therefore enforceable, if the consideration given for the promise is primarily for the promisor's own use and benefit. In this area the terms 'collateral' and 'original' are also sometimes used: 'collateral' referring to a promise for which the promisor does not get the main benefit; and 'original' referring to one where he does." (Emphasis added)

In the testimony as to the oral promise made in behalf of Fagan, the witnesses re-peatedly used such words as "guaranty," "guarantee," and "collateral." The word "guarantee" was used by the court in the special issues submitted to the jury inquiring as to the nature of the promise made by Fagan through the agency of Clark. Thus, the words used in the making of the promise on behalf of Fagan, did not, themselves, denote an intention to create an unconditional liability for the payment of the account represented by the purchase price of the petroleum products delivered to I.M.I.

■ We hold, in response to the first of the three inquiries set out in the Titus case (quoted above), that the words used by the parties in making the promise did not create a primary responsibility in Fagan to pay the debt of I.M.I.

■ As to the second of the three inquiries set out in the Titus case and quoted above, we feel that the inquiry as applied to this case can clearly be answered in the affirmative. There was consideration for Fagan's guaranty of the account of I.M.I. That consideration was the extension to I.M.I. of further credit at a time when it was $250,000.00 in arrears on its current account. Also, the jury found that it was to the direct financial interest and benefit of Albert E. Fagan, himself, that LaGloria continued to deliver its products to I.M.I.

■ As to the third of the three inquiries set out in the Titus case as being those on which the cases have turned, we feel that it, too, can be answered in the affirmative. The consideration given for Fagan's promise was the sort of consideration which the courts say is necessary to take the promise out of the statute of frauds. As noted above, the jury has found that it was to the direct financial interest of Fagan that the delivery of products to I.M.I. continue. The continued delivery of the products was the consideration given to Fagan by LaGloria for his promise. That is one of the component elements of

the "main purpose" or "leading object" rule.

A special issue was submitted to the jury asking if it was "for the main purpose of serving his own financial interest and benefit that Alfred E. Fagan affirmed the representation" of Clark, that he, Fagan, would guarantee payment for the products delivered to I.M.I. The jury did not answer that special issue. The record is not entirely clear as to the action taken in the trial court in connection with the jury's failure to answer it. The judgment recites that it was "withdrawn from consideration of the jury by agreement of the parties." The judgment also recites that the verdict of the jury was received without objection. The appellee takes the position that the parties agreed that the issue might be submitted to the court for its finding of fact. The appellants take the position that under the circumstances, the appellee has waived a finding on such issue. There is nothing else in the record indicating what action was taken than the recitation in the judgment itself. Under the circumstances, we feel that we should place such a construction on the record as is consistent with the judgment rendered by the trial court. We therefore take the position that the trial court, in rendering its judgment for the appellee, made an implied finding consistent with appellee's contention that the main purpose rule was applicable. Rule 279, T.R.C.P.

It is to be noted that the Supreme Court in Titus (supra) said that the cases have turned on "two or more" of the three inquiries listed. Here we have findings by the jury and the court on two of those inquiries in such a manner as to support the appellee's contention that the main purpose rule is applicable. Other cases have held that the Statute of Frauds defense was unavailable under the main purpose rule even when the facts showed that the guarantor did not intend, by his guaranty, to create a primary liability for the payment of the debt which was the subject matter of the guaranty. Dallas Title & Guaranty Co. v.

Jarrell, Tex.Civ.App., 320 S.W.2d 696, no writ history; Stillman v. Hirsch, Tex.Civ. App., 84 S.W.2d 501, affirmed 128 Tex. 359, 99 S.W.2d 270.

We hold that despite the fact that the words used in the oral agreement promising to pay the debt of another are not words denoting a primary unconditional obligation to pay the debt, nevertheless, when the main purpose of the promisor is to get for himself a direct benefit, which direct benefit is the consideration given him for his promise, he may not avail himself of the Statute of Frauds as a defense to his liability on that promise.

The availability of the Statute of Frauds defense to one who has been sued on his oral promise to pay the debt of another, has not been looked on with favor by the courts. As early as Lemmon v. Box (supra), the Supreme Court indicated some doubt as to whether the Statute "has on the whole been beneficial."

In Gulf Liquid Fertilizer Co. v. Titus, (supra), at p. 382 of 354 S.W.2d the following language appears:

"The Statute of Frauds was first enacted in England in 1677. Considering modern rules of evidence and business practice, there are some who believe that insofar as applicable to facts similar to those here, such statute has outlived its usefulness. It is a two-edged sword. It is argued that it may be used to perpetrate frauds as well as to prevent them. Under it a person may obtain a substantial benefit for himself under an oral promise to pay the debt of a third person and then resist payment on the ground that his promise is oral and therefore unenforceable under the Statute of Frauds. Because of this and other dangers, the courts of England and this country have sought to keep the Statute within its intended purpose."

It has often been said that the purpose of the Statute of Frauds is to prevent a fraud, not to protect one. See 26 Tex.Jur. 2d 160, Sec. 9, and cases cited therein.

**658**

Here the jury found on sufficient evidence that the making of the promise of guaranty was to the direct financial interest of Fagan; that he knew that Clark had represented that he would guarantee the payments due LaGloria; that he failed to notify LaGloria until January 23, 1964; that he would not execute a guaranty letter; that he knew that LaGloria would deliver its products to I.M.I. in reliance on the guaranty made in his behalf by Clark; that LaGloria did so believe that he would make such a guaranty and acted in reliance on that belief; and that under the same or similar circumstances as existed after the latter part of December, 1963, and before January 23, 1964, a reasonable person in the position of Fagan, in the exercise of ordinary regard for the interest of others, would have notified LaGloria that he would not execute the written guaranty of payment for products delivered to I.M.I.

The trial court impliedly found that it was for the main purpose of serving his own financial interest that Fagan affirmed the representation by Clark to the effect that he would guarantee payment for the products

■ The evidence showed that after LaGloria began making deliveries in reliance on Clark's promise, that Fagan would guarantee payment, the indebtedness of I.M.I. increased almost $50,000.00. The evidence further showed that during this period of time while the I.M.I. indebtedness was being so increased, Fagan appropriated to himself and to his wholly owned corporation, Cooper Petroleum, substantially all of the valuable assets of I.M.I. Under the circumstances, we feel that Fagan should be, and he is, barred by the principles of equitable estoppel, as well as the main purpose rule, from asserting the Statute of Frauds to avoid liability for his oral guaranty. Wheeler v. White (supra); Bethea v. Wall, Tex.Civ.App., 362 S.W.2d 414; 48 A.L.R.2d 1079.

The judgment of the trial court is in all things affirmed.