In re T. E. MERCER TRUCKING COMPANY, Debtor.

FRUEHAUF CORPORATION, Plaintiff,

v.

T. E. MERCER TRUCKING COMPANY, Debtor, and Ben Gilbert, Operating Receiver and Trustee, Defendants.

In re G. E. M. STORAGE & TERMINAL COMPANY, INC., Debtor.

FRUEHAUF CORPORATION, Plaintiff,

v.

G. E. M. STORAGE & TERMINAL COMPANY, Debtor, and Ben Gilbert, Operating Receiver and Trustee, Defendants.

Ben GILBERT, Operating Receiver and Trustee; T. E. Mercer Trucking Company; and G. E. M. Storage & Terminal Company, Inc., Plaintiffs,

v.

FRUEHAUF CORPORATION, Defendant.

Tommy G. MERCER and Wanda Jo Mercer, Intervening Plaintiffs,

v.

FRUEHAUF CORPORATION, Defendant.

Bankruptcy Nos. BK 4–77–345, BK 4–77–346.
Civ. A. No. CA 4–79–55.

United States Bankruptcy Court, N. D. Texas, Fort Worth Division.

Aug. 11, 1981.

---

## MEMORANDUM OPINION REGARDING SUMMARY JUDGMENT MOTIONS

JOHN FLOWERS, Bankruptcy Judge.

This memorandum announces my rulings on the summary judgment motions filed in the above-captioned cases. This case arose under the Bankruptcy Act of 1898 and I will hear it in two capacities, as a bankruptcy judge in connection with the adversary proceeding filed in the Bankruptcy Court by Fruehauf, and as a special master appointed by Judge Mahon of the U. S. District Court in connection with the suit pending in that court between the trustee, the debtors, Wanda Jo Mercer and Tommy Mercer as intervenors, and Fruehauf. However as it appears that the legal and factual issues are identical in all the proceedings, my rulings announced herein will be applicable to all the cases.

All parties have sought summary judgment on issues arising out of § 20a of the Interstate Commerce Act. Fruehauf seeks summary judgment on numerous other legal issues including limitations, estoppel and subordination. The court record consists of various stipulations, interrogatories and depositions. On the current state of the record, most of the motions for summary judgment are denied in view of the issues of fact that must be resolved before a judgment may properly be rendered. In this memorandum I will discuss the operative legal principals in order to elucidate the parties as to the fact issues that remain unresolved.

## I.

### SECTION 20a OF THE INTERSTATE COMMERCE ACT

Fruehauf Corporation has filed a complaint for relief from the stay asserting that T. E. Mercer Trucking Company and G.E.M. Storage & Terminal Company, Inc. are indebted to Fruehauf. The alleged indebtedness is evidenced by a series of voluminous loan agreements. Fruehauf claims mortgages and security interests in practically all assets of the debtor corporations, including equipment, vehicles, inventory, accounts, operating authorities and real property.

The debtor corporations, the trustee and the intervenors [1] urge the application of § 20a of the Interstate Commerce Act as a defense to liability and affirmatively as the basis of a claim against Fruehauf.[2] Fruehauf replies that § 20a is inapplicable because the loan agreements evidencing the debt are not "securities" and therefore fall outside the jurisdiction of the Interstate Commerce Commission. Upon review of the authorities I am of the opinion that it is immaterial whether the loan agreements

---

1. The intervenors are the sole stockholders of the debtor corporations and are guarantors of much of the corporate debt.

2. At the summary judgment hearing on August 5, 1981 the debtor, trustee and intervenors announced they would no longer urge a usury

claim based on the allegation the debt to Fruehauf is void under § 20a. This concession anticipated my ruling on this issue. A void debt may not be the subject of a usury claim. *O'Quin v. Beanland*, 540 S.W.2d 526 (Tex.Civ. App.—San Antonio, 1976) no writ. hist.

fall within the purview of a "security" as defined by § 20a of the Interstate Commerce Act.

"The starting point in every case involving the construction of a statute is the language itself." *International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558, 99 S.Ct. 790, 795, 58 L.Ed.2d 808 (1979). Section 20a of the Interstate Commerce Act provides in pertinent part:

## "ISSUANCE OF SECURITIES; ASSUMPTION OF OBLIGATIONS; AUTHORIZATION

(2) It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed "securities") or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose."

In 1935, the scope of the Interstate Commerce Act (ICA) was extended to cover common carrier by motor vehicle, see 49 U.S.C. §§ 301–327, Part II of the ICA.

Section 214 of the ICA, 49 U.S.C. § 314 (now 49 U.S.C. § 11302) makes the provisions of Sections 20a(2)–(11) applicable to motor common carriers.

Section 20a of the Interstate Commerce Act has been aptly described as an "early essay in securities legislation," see *United States v. New York, New Haven & Hartford Railroad*, 276 F.2d 525 (2nd Cir. 1959), cert. denied, 362 U.S. 961, 80 S.Ct. 877, 4 L.Ed.2d 876 (1960). A threshold issue is whether this essay in securities legislation may be asserted by the trustee, the debtor corporation and the intervenors against Fruehauf's claim. A review of the legislative history and court interpretations of the purpose of § 20a provide some insight to whether these parties have standing to urge the application of the statute.

The legislative history reflects that one of the purposes Congress enacted § 20a was to protect investors. Consider the somewhat optimistic arguments of Representative Rayburn who sponsored an early draft of the statute:

"Of course, the credit of the railroads has been destroyed. But if we write into the law of the land a statute to the effect that before a railroad can issue new securities, before it can put them on the market it must come before the properly constituted government agency, lay the full facts of its financial situation before that body, tell that body what it intends to do with the money derived from the sale of the issue of securities and after it has received the approval of that regulating body and it goes out and puts those securities on the market then the Interstate Commerce Commission by this law is empowered at any time to call it to account and have it tell to that regulating body that it expended the money, the proceeds of the sale of securities, for the purposes for which it had made the application. Then we shall have railroad securities that will stand for value in the markets of the country and in the markets of all the world." 59 Cong.Rec. 8376 (1919).

In *Interstate Investors, Inc. v. United States*, 287 F.Supp. 374, 387 (S.D.N.Y., 1968)

(three-judge court) aff'd per curiam, 393 U.S. 479, 89 S.Ct. 707, 21 L.Ed.2d 687 (1969), the court stated the dominant Congressional purpose in enacting § 20a was to protect investors in the securities of railroads.

The remedies for violations of the statute confirm that the statute is intended to protect investors. Section 20a(11) provides that the holder of a void security acquired directly from the carrier may at his option rescind the transaction and upon surrender of the security recover the consideration given therefor. If a voided security is acquired for value and in good faith and without notice that the issue or assumption is void, such person may in a suit hold jointly and severally liable for the full amount of the damage sustained by him, the carrier which issued the security and its directors and officers who participated in the authorizing, issuing or selling of the security. Interestingly, Congress omitted the "good faith" requirement with respect to the holders of void securities acquired directly from the carrier which appears to encourage the direct extension of credit to a carrier.

Section 20a has somewhat of a dual function in view of the role given the Interstate Commerce Commission by the statute. The Commission was created for the purpose of facilitating commerce throughout the nation, *Texas & P. R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907). The Interstate Commerce Commission may approve an application for authorization to issue securities, only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose. Section 20a(2). The Second Circuit has expounded upon the "in the public interest" function of Section 20a,

"... we prefer a construction of Section 20a of the Interstate Commerce Act that gives effect to its remedial purposes to give the commission control over stock and bond issues in order to avoid for the future abuses in the issuance of securities whereby railroad properties have been bankrupted or saddled with almost overwhelming burdens of indebtedness, which have not increased the amount of or value of property devoted to the public service, have not improved the service rendered, and have on the whole had the effect of increasing the charges for the service,"

*United States of America v. New York, New Haven & Hartford Railroad Co., et al,* 276 F.2d 525 (2nd Cir. 1959).

■ I find that the purpose and function of § 20a is twofold, (1) to protect investors from worthless issues of railroad and common carrier securities, and (2) to protect the public interest in the efficient and economical operation of interstate carriers. Consequently this "early essay" in securities regulation conceivably may operate to protect both purchasers of securities and the public interest by preserving the financial integrity of the railroad and common carrier securities.

With the above considerations in mind, I turn to an issue that has been marginally addressed by the parties. The trustee and Mercer seek to avoid liability on the theory that the consolidated loan agreements are § 20a securities. It is argued that the securities are void because a statutory duty has been breached by the failure to have Commission approval of the issue.

■ However, a breach of a statutory duty does not give rise to a private cause of action to every person injured by the statutory breach. The law clearly demands that the statutory breach must cause injury to one of the class that the statute is designed to protect, *Greater Iowa Corporation v. McLendon*, 378 F.2d 783, 790 (8th Cir. 1967); *Cambridge Capital Corporation v. Northwestern National Bank*, 350 F.Supp. 829 (D.Minn., 1972).

Section 20a does not purport to protect the issuer of securities. In fact it places the risk of non-compliance upon the issuer and its directors, officers, attorneys and other agents, who participated in the issuing of the voided security. The trustee and Mercer seek to shift the risk of non-compliance upon the holder (Fruehauf) by requesting the court to void the debt or in the alternative void the security interests and mortgages that secure the debt. The remedy for violation of § 20a proposed by the trustee, which in effect penalizes the investor, stands contrary to the primary purpose of the statute which is to protect investors. The trustee and debtor have focused on the use of the "security... shall be void" language. The court, however in interpreting a statute, must not be guided by a single sentence or member of a sentence, but must look to the provisions of the whole law and to its object and policy, *Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975). The statute clearly contemplates that the holder of an unauthorized § 20a security may assert a rescission claim against the issuer. If the § 20a security is in the form of a bond or other debt instrument secured by an interest in property, I am of the opinion that the bondholder's rescission claim under § 20a(11) would likewise be treated as secured in the bankruptcy context. It would be absurd to interpret this investor protective statute so as to give the investor a remedy of rescission, yet if such remedy is exercised the investor forfeits any liens securing the indebtedness. In interpreting a statute, the courts are to respect the policy of Congress so as not to impute to the statute a self-defeating, if not disingenuous purpose, *Dalia v. U. S.*, 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979).

The trustee and Mercer have raised the spectre of Fruehauf's heavy-handed lending practices in attacking Fruehauf's claim. Noting that the proceeds of the trucking company loan went toward the retirement of personal debts and beer inventories, the brief of the Plaintiff-Debtor raises the rhetorical question: "Is there the slightest doubt in the Court's mind what would have happened to this agreement had it been presented to the Interstate Commerce Commission for approval?"

I have no serious doubts about how the Commission would have ruled with respect to some of the indebtedness in view of the posture taken by the Commission in numerous decisions, see *Mutrie Motor Transportation, Inc.*, 116 Motor Carrier Cases 99 (1972). But I do entertain serious doubts that Congress intended § 20a to be used as a vehicle by carriers to avoid undesired investment obligations.

This is not to say that I endorse Fruehauf's alleged conduct which suggests an intent on Fruehauf's part to circumvent I.C.C. review of the consolidated loan agreements. Fruehauf's conduct will be carefully scrutinized for misconduct that may mandate application of the court's equitable subordination powers.

However Congress chose not to include a statutory remedy for misconduct on the part of the holder of a § 20a security. Consequently I hold that the trustee and Mercer lack standing to assert a claim based on the alleged violation of § 20a of the I.C.C. Act. Thus it is unnecessary to decide whether the consolidated loan agreements are § 20a securities.[3] Fruehauf's

---

**3.** The parties extensively briefed the issue of what evidences of indebtedness fall within the purview of § 20a. All recognize that *Ex parte 275 [Association of American Railroad v. U. S.]*, 603 F.2d 953 (D.C.Cir.1979) is the leading authority. It sets forth two salient factors in determining whether a particular transaction is a security under § 20a. The first factor looks to general principals of federal securities laws to determine whether the debt is in the nature of a security. The Fifth Circuit follows the investment/commercial dichotomy test which

is premised on the view that Congress' concern in enacting the securities laws was to regulate practices associated with investment transactions and that the securities laws were not designed to regulate commercial transactions. *McClure v. National Bank of Lubbock*, 497 F.2d 490 (5th Cir. 1974), focused upon two factors in determining whether "notes" are securities: (1) were the notes offered to some class of investors or were they acquired by the creditor for speculation or investment, (2) alternatively did the debtor obtain investment assets, directly or

motion for summary judgment on this issue will be granted.

## II.

### THE ALLOCATION OF DEBT LIABILITY AND USURY CLAIMS

The court has under review a series of agreements regarding the indebtedness owing from what are described as the "Corporate Debtors" and the "Guarantors." These agreements were preceded by loans to various entities at different times, the details of which are not before the court. The parties agree at least some of the prior loans were to entities other than the "Corporate Debtors" and the "Guarantors." The initial consolidated loan agreement dated December 1, 1969, contains a listing and acknowledgment of existing obligations owing to Fruehauf. The agreement recites, "Whereas the parties hereto desire to consolidate the obligations owing to Fruehauf in a single loan arrangement without altering the existing obligations or security given therefor." After reciting various debts and future advances the agreements sets forth a payment schedule, with payments to be made by the Corporate Debtors.

Apparently only two corporate entities survived to actively participate in the September 16, 1977 agreement, T. E. Mercer Trucking Company and G.E.M. Storage & Terminal Co., Inc. In this agreement the corporate debtor and guarantor parties "recognize, admit and affirm all of the foregoing indebtedness owing by them, individually, jointly or severally, to Fruehauf Corporation." Fruehauf was given the right to "undertake and order the liquidation of some, any and all of the assets of either or both of said corporations and/or the equipment company and/or claimed sole proprietorships and apply the net proceeds thereof to the indebtednesses owing by the debtor and guarantor parties to Fruehauf Corporation."

Oddly enough none of the various agreements go so far as to recite that the corporate debtors are jointly and severally liable for the entire indebtedness. The trustee, debtors and intervenors contend that the 1969 agreement constituted simply a convenient means to include in one document provisions relating to different loans, and thus each entity is obligated only for the repayment of monies that went to its benefit. Fruehauf responds that the parties intended the corporate debtors to be co-obligors under the consolidated loan agreement in spite of the fact that they received unequal benefits. Fruehauf asserts that a "community of interest" provides sufficient consideration to create a joint and several obligation and thus each corporate debtor is liable for the entire indebtedness.

The central issue is whether the parties intended the "corporate debtors" to be jointly and severally liable for the aggregate amount of indebtedness reflected in the various consolidated loan agreements or whether the parties intended the agreements to be a mere reaffirmation of existing indebtedness with each corporate debtor liable only for its historical share of the total indebtedness recited.[4] This issue is

indirectly, in exchange for its notes. The investment/commercial dichotomy provides an analysis helpful in explaining the holdings in numerous I.C.C. cases cited by the parties, see *Lehigh Valley Railroad Company*, 1 Fed. Carrier Cases 328 (1939); *Mutrie Motor Transportation, Inc.*, 116 M.C.C. 99 (1972) and *Hays Freight Line, Inc.*, 39 M.C.C. 576 (1944).

Ex parte 275 further recognized that § 20a was intended to be limited to "issues" of securities, and thus imposed an element that the security be in transferable form. A transferable evidence of indebtedness is one that has negotiable or quasi-negotiable characteristics; see *REA Express, Inc. v. Alabama Great Southern*, 427 F.Supp. 1157 (S.D.N.Y., 1976), and

*Transcontinental Bus System, Inc.*, 80 M.C.C. 54 (1959). The second element is met if the debt instrument is in a form that the issuer and initial holder of the instrument could reasonably anticipate that the instrument would be transferred to a member of the class that § 20a is designed to protect. However I find it unnecessary to apply this analysis to the consolidated loan agreement as I conclude that § 20a does not operate to deprive Fruehauf of its secured creditor status even in the event the agreement is a security.

4. I am addressing the in personam liability of each debtor corporation. The cross-collateralization agreements make each corporation's assets liable for the other's individual indebtedness.

important because it will determine the amount of each entity's liability to Fruehauf. Once each entity's liability is established the effective interest rate charged by Fruehauf may be calculated by comparing the interest charged to each entity's debt liability. If each corporate debtor were obligated for the entire indebtedness the interest to debt ratio would obviously be less than if each debtor is liable only for its historical share of the debt.

■ Ultimately the court must interpret the language of the consolidated loan agreements. Under the parole evidence rule, the standard of interpretation of a written contract is usually the meaning that would be attached to it by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to, and contemporaneous with, the making of the contract other than the oral statements by the parties of what they intended it to mean, *Zell v. American Seating Co.*, 138 F.2d 641 (2nd Cir. 1943). I believe it appropriate to allow the parties an opportunity to develop the circumstances surrounding the execution of the loan agreements for the purpose of ascertaining the parties' intent. Consequently I will deny summary judgment on the issue of whether each corporate debtor was intended to be liable on the entire consolidated indebtedness or only its historical share.

■ Several subsidiary issues will arise upon my deciding the above issue. Assuming a finding that the "corporate debtors" intended to be jointly and severally liable for the entire consolidated indebtedness, the issue of sufficient consideration comes into view. The trustee, debtors and intervenors rely on V.T.C.S. art. 1302–2.06 which provides that no corporation "shall create any indebtedness whatever except for money paid, labor done, which is reasonably worth at least the sum at which it was taken by the corporation, or property actually received, reasonably worth at least the sum at which it was taken by the corporation." This statute is declaratory of the common law of ultra vires as it existed

before its enactment, *Cooper Petroleum Co. v. LaGloria Oil & Gas Co.*, 423 S.W.2d 645 (Tex.Civ.App.—Houston [14th Dist., 1967] ). Historically Texas courts were reluctant to enforce one entity's indebtedness against a guarantor corporation where the guarantor received no substantial benefit from the guarantee, see *Rio Grande Valley Gas Co. v. Grand Rapids Store Equipment Corporation*, 57 S.W.2d 348 (Tex.Civ.App.—San Antonio, 1933) no writ. hist. However by the enactment of art. 2.04 A of the Texas Business Corporation Act the legislature precluded a corporation from pleading ultra vires as the basis for a claim or defense when sued on its contract, *Cooper Petroleum*, supra; *Inter-Continental Corp. v. Moody*, 411 S.W.2d 578, (Tex.Civ.App.—Houston, 1967) and *Republic National Bank of Dallas v. Whitten*, 383 S.W.2d 207 (Tex. Civ.App.—Dallas, 1964) aff'd 397 S.W.2d 415 (Tex., 1966). Consequently the provisions of art. 1302–2.06 may only be asserted as the basis for a claim against the directors and officers who have benefited from the ultra vires activities.

Thus in the event the consolidated loan agreements were intended to create a joint and several liability on the part of the debtor corporations, the trustee and Mercer may not assert art. 1302–2.06 as a defense to joint and several liability of each debtor corporation. I am further of the opinion that the trustee and Mercer may not assert art. 1302–2.06 for the purpose of determining each debtor corporation's principal balance owing in order to set up a usury claim against Fruehauf.

Returning now to the primary fact inquiry and assuming I find the parties intended that the corporate debtors would be liable only for their historical portion of the consolidated indebtedness (as the trustee and Mercer contend), an alternative usury claim might be asserted under the rule of *Windhorst v. Adcock Pipe and Supply*, 547 S.W.2d 260 (Tex., 1977). This usury claim would be based on the fact that although each debtor corporation is liable only to the

extent of its historical portion of the consolidated indebtedness, Fruehauf charged or received from each debtor corporation interest on the entire indebtedness. The ratio of total interest received or charged vis-a-vis the amount actually owed by each corporate debtor could exceed the legal interest rates.

To illustrate this usury theory, assume that three individuals, A, B, C, each purchases from store F a $200 item on credit. Each signs a promissory note for $200 payable at a lawful annual percentage rate of 18%. One year later the store sends A a statement charging interest in the amount of $108 (18% times $600) intending to hold A liable for the entire amount of interest charged. Under the *Windhorst* decision, A would have a usury claim against F whether or not any interest was actually paid.

Assume that A, B, C and store F executed a consolidated agreement which lists all indebtedness owed by A, B, and C, however it provides that F may recover from A only its share of principal and interest, and likewise limits F's recovery from B and C to their proportionate share of accrued interest and principal. In such case F has "contracted" for legal interest. But further assume that F subsequently sends A a bill for the total accrued interest of $108. In such event F would have "charged" A usurious interest within the meaning of Article 5069–1.06 as interpreted by the *Windhorst* decision, supra.

■ The action taken by F in billing A for the entire amount manifests an intent to repudiate the prior agreement and charge a usurious interest rate to A. The subjective intent of the creditor to charge only a legal rate of interest is immaterial, see *Cochran v. American Savings and Loan*, 586 S.W.2d 849 (Tex., 1979). To avoid usury penalties F must plead and prove that such charge and receipt of usury was a result of accidental and bona fide error.

■ Finally it is possible to interpret the consolidated loan agreement in a manner such that the parties "contracted" for a usurious interest rate. Such construction would require my finding that although Fruehauf could hold each corporate debtor liable only for its historical portion of the consolidated debt, Fruehauf could nevertheless hold each corporate debtor responsible for the aggregate interest accruing on the entire consolidated debt. I find the language of the agreements sufficiently ambiguous so that as a matter of law I am unable to preclude such a construction. However it is fair to state at this juncture that to interpret the consolidated loan agreements so that the corporate debtors are not jointly and severally liable on the consolidated debt and yet are jointly and severally liable as to the accrued interest on the consolidated debt would be a bit strained.

■ I am unable to conclude as a matter of law that Fruehauf is not liable for the usury penalties provided by article 5069–1.06 V.T.C.S. Consequently the motion for summary judgment on the usury issue is denied in view of the factual issues that remain unresolved.

## III.

## THE ISSUE OF STANDING

In response to Fruehauf's motion for relief from the stay, the trustee answered and counterclaimed that Fruehauf was the partner, joint venturer or in the alternative the alter ego of the debtor. This position is based on the undisputed fact that at various times Fruehauf assumed management responsibilities and incurred debt for the debtor pursuant to the terms of the consolidated loan agreements. In its motion for summary judgment Fruehauf asserts that neither the trustee nor debtor has "standing" to assert the partnership, joint venture or alter-ego theory.

■ The law of standing, the Supreme Court says, is a "complicated specialty of federal jurisdiction, the solution of whose problems is in any event more or less determined by the specific circumstances of individual situations," *U. S. ex rel. Chapman v. Federal Power Comm.*, 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918 (1953). The

federal courts are to look into the nexus between the status asserted by the litigant and the claim he presents to assure that he is a proper and appropriate party to invoke federal judicial power, *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

Fruehauf contends that the trustee does not have standing to recover alleged debts owing to the creditors of the bankrupt from the partner, joint venture or alter ego of the bankrupt. I hold the trustee does not have the right to collect debts from alleged non-bankrupt partner,[5] joint venturer or alter ego. Such cause of action belongs solely to each partnership creditor, see for example *Krivo Industrial Sup. Co. v. National Distill.*, 483 F.2d 1098 (5th Circuit, 1973). The trustee however does have standing to assert the partnership, joint venture or alter ego status for the purpose of subordinating one creditor's claim to the claims of other creditors under the doctrine of equitable subordination. I will therefore grant Fruehauf's motion for summary judgment on the trustee's lack of standing issue except to the extent the trustee relies on the partnership, joint venture or alter ego theory as the basis for subordinating Fruehauf's claim to those of other creditors.

### IV.

### I.C.C. PERMIT ISSUE

The trustee alleges Fruehauf took control and possession of Mercer and its I.C.C. permits without the approval of the Commission and such fact renders invalid any pledge of the permits. Fruehauf has moved for a summary judgment on this issue. It has received minimal attention in the briefs and arguments of counsel and no authorities have been cited in support or contrary to Fruehauf's motion. However in view of the representations of counsel during the hearing on this motion held on August 5, 1981, that this issue will receive further attention, I will at this point deny

Fruehauf's motion for summary judgment on the void pledge issue.

### V.

### THE WAIVER AND ESTOPPEL ISSUES

Fruehauf in its motion for summary judgment asserts that the debtor corporations and guarantors waived any defenses or counterclaims to Fruehauf's claims pursuant to the agreement of September 16, 1977 which states in pertinent part:

> "All of the undersigned debtor and guarantor parties hereto: Recognize, admit and affirm all of the foregoing indebtedness owing by them, individually, jointly or severally to Fruehauf Corporation, and acknowledge that all of the same have been matured and are now owing, past due, and not subject to credit offset or counter-claims of any kind."

The trustee and Mercer have countered that such agreement was conditioned on certain subsequent events which never materialized. At the summary judgment hearing on August 5, 1981, Fruehauf urged that the 1977 agreement equitably estopped Mercer from asserting defenses and claims arising out of the loan agreements.

Factual issues exist which preclude my granting a summary judgment on the waiver and estoppel theories. Waiver is operative only where the person charged has actual or constructive knowledge of all the material facts concerning the right or privilege involved. No one can be said to have waived that which he does not know, *Bering Mfg. Co. v. Carter and Bro.*, 255 S.W. 243 (Tex.Civ.App.—Beaumont, 1923) affirmed 272 S.W. 1105; see also 60 Tex. Jur.2d Waiver § 6, p. 187. A factual issue exists as to whether the corporate debtors relinquished a known right for a valuable consideration.

As to Fruehauf's estoppel claim, Fruehauf must show that it acted upon Mercer's representations without knowledge of the falsity of such representations.

---

**5.** Such is the implication of 11 U.S.C. § 23(i) [Bankruptcy Act § 5(i)] which provides that where only one partner is adjudged bankrupt, the partnership property shall not be administered unless by consent.

To successfully urge estoppel, Fruehauf must show not only ignorance of the true circumstances of a transaction, but also that there was no convenient or available means of acquiring knowledge of the truth with reference thereto, *Holland v. Blanchard*, 262 S.W. 97 (Tex.Civ.App.—Dallas, 1924) err. dismd. A fact issue exists as to whether Fruehauf had knowledge of the existence of offsets, credits and counterclaims when Mercer signed the September 16, 1977 agreement. Furthermore the party claiming it was misled by the representations must show that it changed position in a manner that it will be injured if estoppel is not invoked, *Stanolind Oil & Gas Co. v. Midas Oil Co.*, 173 S.W.2d 342 (Tex.Civ.App. —Galveston, 1943) revd. on other grounds 179 S.W.2d 243.

## VI.

## THE "ANTITRUST" VIOLATION

██ Fruehauf seeks a summary judgment on the anti-trust issue contending that no summary judgment evidence exists to support the anti-trust action alleged by the trustee and Mercer. While the anti-trust issue has received minimal attention in the pleadings and briefs of the parties, there is before the court excerpts from depositions, interrogatories and agreements which if viewed most favorably to the trustee and Mercer provide some faint evidence of an anti-trust violation. It is expected that the trustee and Mercer will more fully develop the alleged violations before the trial of this matter. At this juncture Fruehauf's motion for summary judgment is denied.

## VII.

## CONSOLIDATION

██ Fruehauf seeks summary judgment denying consolidation of the bankruptcy estates of T. E. Mercer Trucking Company and G.E.M. Storage and Terminal in the event it is found that the corporate debtors are not jointly and severally liable for Fruehauf's total claims. The bankruptcy court has jurisdiction to consolidate proceedings and to merge the assets and the liabilities of the debtors. This jurisdiction is based on considerations of equity, one of the touchstones of the bankruptcy court's jurisdiction, *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966). However the court must be mindful that consolidation in bankruptcy is no mere instrument of procedural convenience but a measure vitally affecting substantive rights, *In the Matter of Flora Mir Candy Corp.*, 432 F.2d 1060, 1062 (2nd Cir. 1970). In the case sub judice Fruehauf asserts that consolidation will injure its substantive rights. Of course Fruehauf's rights have been challenged and further fact finding must occur before the extent and priority of those rights may be determined. Controverted issues of fact are thus implicit in the consolidation issue, and Fruehauf's motion for summary judgment on consolidation is denied pending resolution of the enforceability and priority position of its claims.

## VIII.

## STATUTE OF LIMITATIONS

██ Fruehauf asserts that the offsets, credits and defenses claimed by the trustee and Mercer are barred by limitations. However it is settled by many decisions that the statute of limitations is not applicable to matters set up strictly by way of defense, *Rutherford v. Carr*, 99 Tex. 101, 87 S.W. 815 (1905); *Morriss-Buick Co. v. Davis*, 127 Tex. 41, 91 S.W.2d 313 (Sec. A, 1936), 37 Tex.Jur.2d Limitations of Actions § 18. Fruehauf's ·motion for summary judgment on the statute of limitations issue is denied, however I reserve opinion as to whether the trustee's and Mercer's claims against Fruehauf are barred by limitations if asserted affirmatively as a ground for recovery rather than as a defense to the alleged indebtedness.

## IX.

## THE POST–PETITION RECEIVABLE ISSUE

██ The trustee and Mercer seek to attack Fruehauf's secured status by ques-

tioning whether post-petition receivables of Mercer may be substituted as Fruehauf's collateral for pre-petition receivables consumed by the trustee's post-petition operations. Again overriding this issue is the factual determination to be made as to the priority of Mercer's indebtedness to Fruehauf. Assuming that such indebtedness exists, and the security interests are not subordinated on other grounds, I will follow the rule of *In the Matter of Sequential Information Systems, Inc.*, 4 C.C.H. Sec. Trans. Guide ¶ 51479 (S.D.N.Y., 1970). In that decision the court held that a creditor secured by inventory has no right, title or interest in and to and no claim upon inventory purchased by the debtor-in-possession subsequent to the filing of the petition for arrangement herein and any accounts receivable created from the sale thereof, except insofar as such inventory is paid for with funds of the debtor which is subject to the creditor's pre-petition lien.

To the extent that Fruehauf traces the proceeds of encumbered pre-petition assets into post-petition property or accounts acquired by the trustee or debtor-in-possession, I hold it has an enforceable lien on such post-petition assets. Plaintiff's summary judgment motion is denied in view of the lack of a factual record before the court to determine which pre-petition and post-petition property is subject to the lien.

## X.

### EQUITABLE SUBORDINATION

It is clear that a factual issue exists as to whether Fruehauf may be equitably subordinated to other creditors. Before the court may exercise its equitable power three conditions must be met: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act, see *In re Multiponics*, 622 F.2d 709 (5th Cir. 1980); *In the Matter of Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir.

1977). The claims however may be subordinated only to the extent necessary to offset the unfair advantage or the harm which the creditors suffered on account of the inequitable conduct, *Mobil* at 701. Fruehauf argues it should not be responsible for any creditor harm from its actions because creditors could have ascertained that Fruehauf had liens on substantially all of the debtor's property and any extensions of credit were imprudent. The doctrine of equitable subordination deals with inequitable conduct resulting in either unfair advantage or creditor harm and is not dependent on creditor reliance or prudence. Actual fraud need not be established, *Multiponics* at 720.

As discussed earlier in the opinion, I will give significant attention to alleged conduct of Fruehauf in seeking to circumvent the review by the Interstate Commerce Commission of the consolidated loan agreements. If such intent to circumvent I.C.C. control is found and if I find that the conduct resulted in fewer assets available for distribution to the unsecured creditors, Fruehauf's claim will be subordinated to the extent the unsecured creditors were injured.

The court will also look at the "creditor control" exercised by Fruehauf pursuant to the various consolidated loan agreements. These remarkable loan contracts gave Fruehauf joint control of all bank accounts of the Corporate Debtors requiring co-signatures for substantial checks, gave Fruehauf the right to place its designee on the Board of Directors of the Debtors; required all corporate by-laws, stock books and certificates to be delivered to Fruehauf's counsel; gave Fruehauf the right to have one of its employees participate in the day-to-day operations of the Debtor's premises with complete veto powers on any items or matters whatsoever; gave Fruehauf the right to require the liquidation of all assets of the Debtors and the various other ventures; gave Fruehauf the right to set salaries of officers and directors; required the Corporate Debtors to pledge all their stock, and provided in the event of a dispute between the Mercer management and the Fruehauf

monitoring agent that an appeal would lie to the Fruehauf management for final determination.

The extensive creditor control evidenced by the loan agreement suggests that the debtor corporations were mere instrumentalities or the alter ego of Fruehauf. If Fruehauf's actual control was as dominant as the consolidated loan agreements indicate, such fact pattern may satisfy the inequitable conduct element of the trustee's subordination claim, see *In re American Lumber Co.*, 5 B.R. 470 (D.Minn., 1980). If I find Fruehauf gained an unfair advantage or that creditors suffered harm as a result of its alleged control, the bankruptcy court's equitable powers may be invoked to subordinate Fruehauf's claims to the extent necessary to remedy the inequitable conduct. The trustee is allowed leave to amend its pleading so as to make a more definitive statement of Fruehauf's inequitable conduct and the nature and extent of any alleged damages.

█ The determination necessary to resolve the subordination issue will require further evidentiary hearings. Consequently Fruehauf's motion for summary judgment on equitable subordination issue is denied.

The foregoing constitutes my conclusions of law pursuant to F.R.C.P. 52 and my initial report as special master pursuant to F.R.C.P. 53(e).