## In re BEVERAGES INTERNATIONAL LTD. and N.P. Beverages Corp., Consolidated Debtors.

### Bankruptcy No. 84–895–JG, 84–1361–JG.

United States Bankruptcy Court,
D. Massachusetts.

June 21, 1985.

Charles Blumsack, DeStafano & Canzano, Woburn, Mass., for movant.

Arthur Kreiger, Palmer & Dodge, Boston, Mass., for debtor.

## MEMORANDUM

HAROLD LAVIEN, Bankruptcy Judge.

This contested matter comes before the Court on the Motion of M.H. Gordon & Sons, Inc. ("M.H. Gordon") for Relief from Stay, which seeks an order allowing it to apply proceeds of the debtor's sales of assets to a $250,000 alleged secured obligation. M.H. Gordon asserts that it is a secured creditor of the debtor by reason of a $250,000 loan that Richard Gordon made to the debtor in April 1982, and a security agreement in all assets of the debtor that Richard Gordon assigned to M.H. Gordon. The creditors committee and the debtor filed objections to the Motion. Both argue that the loan made by Richard Gordon was actually a capital contribution and the claim should be subordinated. The debtor also contends that the security interest was not supported by consideration. A trial was held and briefs were filed. Based upon the testimony and documentary evidence the Court makes the following findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 (1983).

An involuntary petition under Chapter 11 of Title 11 of the United States Code was filed against the debtor, Beverages International, Ltd., ("the debtor" or "Beverages") on July 6, 1984. Formerly known as N.P. Beverages, the debtor based in Lawrence, Massachusetts, was in the business of distributing liquor. Prior to 1982 all the stock was owned by members of the Cicerchia family. In April 1982 Richard Gordon purchased one third of the outstanding stock. In December 1982, Beverages acquired Narragansett Sales, Inc. whose corporate name was changed to N.P. Beverages Corp. ("N.P.") N.P. filed a voluntary chapter 11 petition on October 22, 1984. After hearing on January 28, 1985 this Court confirmed a consolidated liquidating plan for both debtors. The plan provided that the claims of secured creditors, except that of M.H. Gordon, would be paid within thirty days of confirmation. Throughout the history of this case, and expressly in the disclosure statement and plan, the debtor has disputed M.H. Gordon's claim. Prior to and at the hearing on confirmation, all interested parties agreed that confirmation could take place with the reservation that the treatment of the M.H. Gordon claim would depend on the outcome of this litigation.

In January 1982 Richard Gordon and the Cicerchias commenced negotiations for Gordon's purchase of stock in Beverages. In a memorandum of intent dated April 5, 1982 Richard Gordon agreed to purchase one third of the outstanding stock of Beverages as well as stock in Gannfal Realty Corporation (50%), T & S Trucking, Inc. (50%) and T & W Leasing Corporation from Freddy Cicerchia, Carla Cicerchia, Penelope Peckos and Nicholas Peckos for a total price of $110,000, $5,000 to be paid in cash at the closing and $105,000 by way of a promissory note. As part of the same transaction, Richard Gordon agreed to loan Beverages $250,000. Richard Gordon also agreed to cause the brand lines of M.H. Gordon & Son, Inc., to be transferred to Beverages.

M.H. Gordon & Son, Inc. was a Massachusetts Corporation also in the liquor distribution business. Its president, Ira B. Gordon, Richard's father, owned all outstanding stock and was president until his death on September 20, 1983. Prior to Ira's death, Richard was vice president and treasurer of M.H. Gordon, his duties consist of sales, buying and managing. Thereafter, he became president of M.H. Gordon.

Beverages also entered into an agreement dated April 1, 1982 for the liquidation of part of Gordon's wholesale liquor business, including inventory and product lines. The stock sale agreement further provided that Fred Cicerchia, Sr. would be retained as an employee on a part-time basis. A more complete stock purchase agreement containing these essential terms was executed by the parties on April 28, 1982, to be effective as of April 1, 1982. The closing on the stock sale was held on April 28, 1982. By check No. 665 dated April 28,

1982 drawn on Baybank Middlesex account No. 4517725, Richard Gordon advanced $250,000 to Beverages which check was deposited into Beverages checking account. On the same date Beverages gave Richard Gordon a promissory note for $250,000 payable without interest, and monthly principal payments of $3333.33 were to commence on April 1, 1987, and the entire balance became due in 1993. At the time of the closing the Cicerchias and Gordon agreed that Beverages would not grant a security interest to secure the $250,000 loan because such an encumbrance would hurt refinancing efforts. Also on April 28, 1982 Richard Gordon executed a $250,000 promissory note on the exact terms as the Beverages note payable to M.H. Gordon. By check dated April 30, 1982, drawn on its corporate checking account, M.H. Gordon advanced Richard Gordon $250,000 which he deposited into his personal checking account.

After the closing Anthony Cicerchia remained as president of Beverages, and Richard Gordon became vice-president and treasurer. Although Ira Gordon was not an officer or stockholder, he attended all director's meetings and was responsible for changing the debtor's attorneys and accountant to his own. According to one witness, Joseph Finn, debtor's former accountant, even before the April 1982 closing, Ira appeared to be the company's chief decision maker. Pursuant to the agreement to buy inventory from M.H. Gordon, two weeks after the closing Beverages paid M.H. Gordon $180,000 for liquor inventory and certain liquor distribution lines. Much of the inventory, chosen by Richard Gordon, was not saleable. Moreover, M.H. Gordon did not transfer some of the distribution lines as promised. After the Gordon stock purchase Ira Gordon directed the debtor's comptroller Burton Leeds to work at M.H. Gordon's place of business for six months, for which neither Leeds nor the debtor was paid.

In December 1982 Ira and Richard Gordon proposed that Beverages purchase another liquor distributing company Narragansett Sales of Southeastern Massachu-setts, Inc. (now known as NP Beverages Inc.) ("NP") owned by the Gordons, which although located in Southeastern Massachusetts did compete with Beverages for several accounts. The purchase price was $24,000 plus a $28,000 capital contribution each from the stockholders, Freddy and Anthony Cicerchia, and Richard Gordon. As part of the purchase Beverages agreed to assume a lease of property owned by an entity controlled by the Gordons and to buy computer hardware and software from Ira Gordon for $25,000. The closing concerning these transactions took place on December 9, 1982.

In addition to executing the documents concerning the purchase of Narragansett by Beverages, on December 9, 1982, Freddy A. Cicerchia and Anthony Cicerchia, acting as clerk and president of Beverages respectively, executed a security agreement granting Richard Gordon a security interest in all assets of Beverages to secure payment of the April 28, 1982 promissory note. Freddy Cicerchia testified that he did not know he was signing a security agreement on December 9, 1982. Attorney Wolf, who represented Gordon at the closing, testified that he did not recall explaining each document to the parties. Benoit, the accountant also present at the closing which took place at his office, could not say that the security agreement was specifically addressed. A form UCC 1 financing statement perfecting the security agreement was recorded with the Secretary of State and City Clerk on December 13 and 15, respectively. The financing statement listed the debtor as N.P. Beverages, Inc. and secured party as Richard A. Gordon and also stated that "[T]he within security interest has been assigned to M.H. Gordon & Son, Inc., 11 Moody Street, Waltham, Ma." Richard Gordon executed an undated document entitled "Assignment", which provides for the assignment of his rights in the security agreement to M.H. Gordon & Son, Inc.

In December 1983, Beverages refinanced its operations through a loan granted by Mutual Bank, secured by all of the debtor's

assets. On December 19, 1983, Richard Gordon executed an agreement to subordinate the $250,000 to any present and future indebtedness of Beverages to Mutual Bank. The agreement does not indicate that the note or security agreement was assigned to M.H. Gordon. Sometime after January 5, 1984, by an undated letter, Richard Gordon, on behalf of M.H. Gordon, executed a subordination agreement in connection with Mutual Bank refinancing. In a personnel questionnaire concerning NP Beverages, Inc. submitted to the Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Richard Gordon stated that he had invested $250,000 in Beverages to date and that the source of the funds was "I.B. Gordon". During 1983 employees of a wholly-owned subsidiary of M.H. Gordon & Son, Inc., Consodine Boston Distribution Co., Inc., were paid through Beverages International, Ltd.

The sale of Narragansett to the debtor in December 1982 was financially burdensome to the debtors' business, as the costs of maintaining a second facility and lack of management controls outweighed the benefit of expansion. As of the date of the filing of the bankruptcy petition, the consolidated debtors owed approximately $3,000,000 to secured creditors (not including M.H. Gordon) $213,000 to taxing authorities and over $3,000,000 in unsecured debt. The Statement of Affairs filed by the debtors indicates for the two years prior to the filing, the debtors sustained operating losses. Unsecured and secured debt accumulated as a result of the purchase of Narragansett.

 The creditors' committee argues that the M.H. Gordon claim must be subordinated, without the necessity of findings by the Court, because the confirmed plan provides for subordination of all insiders' claims. Proceedings to subordinate under 510(c) may be part of a plan. *See* Advisory Committee Note to Rule 7001. However, basic due process requires notice and a hearing prior to modification of a valid claim via equitable subordination. In enacting § 510(c) of the Bankruptcy Code Congress rejected the notion that claims of insiders should be automatically subordinated. *See L. King, 3 Collier On Bankruptcy,* ¶ 510.05 at 510–03–05 (15th ed. Supp.1984). Moreover, throughout this proceeding the debtor and creditors have stipulated that treatment of M.H. Gordon's claim would depend on the outcome of this litigation. Its current argument that the claim is to be treated as any other insider's claim is inconsistent with this position.

 "... Claims in bankruptcy must be examined an allowed on two levels, the legal and the equitable. The bankruptcy court must determine first that the claim is cognizable as a legal obligation when viewed within the context of non-bankruptcy and bankruptcy laws, and second that the effect of the allowance of the claim in the bankruptcy proceeding would be just and fair in relation to other creditors' under principles of equity jurisprudence." A. DeNatale and P. Abram, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors,* 40 Business Lawyer No. 2, 417, 419 (1985) (hereinafter referred to as *"DeNatale & Abram"*). The bankruptcy court retains full authority to determine the validity of the claim under state law. *L. King, 3 Collier On Bankruptcy,* ¶ 502.02[1], at 502–23–25 (15th ed. Supp.1984). Assuming its validity, for distribution purposes, the bankruptcy court may then superimpose federal bankruptcy conceptions of equitable principles over state law. *DeNatale and Abram,* 40 The Business Lawyer, *supra,* at 420. 11 U.S.C. § 502(b)(1) requires the disallowance of a claim "unenforceable against the debtor ... under ... applicable law." If a claim is invalid under state law for lack of consideration, it is to be disallowed. *L. King, 3 Collier On Bankruptcy,* § 502.02 at 502.24 & n. 14 (15th ed. Supp.1984). The creditors committee argues that M.H. Gordon's secured claim is unsupported by valid consideration because when it obtained the security interest the note was not in default. I find that the debtor signed the security agreement covering its collateral. The issue presented is whether "value" was giv-

en for the security interest. M.G.L. c. 106 § 1–201(44) defines value:

> (44) "Value," Except as otherwise provided with respect to negotiable instruments and bank collections ... a person gives value for rights if he acquires them..
>
> (b) As security for or in total or partial satisfaction of a pre-existing claim ...

M.G.L. c. 106 § 1–201(44) (Supp.1983). The comment to the statute states that the provision continues the definition of value under prior law which provided that value was any consideration to support a simple contract, including the taking of property in satisfaction of or as security for a pre-existing claim. *Uniform Commercial Code Comment,* Par. 44. The focus of this section is on whether the secured party gave value not on whether the person whose assets were pledged received consideration. *In re Terminal Moving and Storage Co., Inc.,* 631 F.2d 547 (8th Cir. 1980). That a mortgage or security interest is given to secure previous unsecured loans or advances does not render it unenforceable under the UCC which expressly recognizes that value is given when rights are acquired for a pre-existing debt. *In re Lowell,* 20 B.R. 464, 467 (Bankr.D.Mass. 1982). The security agreement need not be supported by any new consideration, forbearance by the lender, or foregiveness of the obligation at the time of the mortgage, unless the mortgagee was a stranger to the debt. 59 CJS Mortgages, at 136–37 § 91 (Supp.1984).

▪ In this case, the debtor owed $250,000 to Richard Gordon on a pre-existing unsecured note at the time it gave him a mortgage in December 1982. The prior obligation must be considered a valid one. The evidence is clear that the debtor received the $250,000 in cash at the time of the note. While if it were an open matter it would seem clear that an antecedent debt not in default offers no fresh consideration to support a security agreement, the UCC forecloses this issue. In light of the existence of this valid antecedent debt, there was "value" given for the subsequent se-

curity agreement. M.H. Gordon has a legally cognizable claim against the debtor. Notwithstanding the legal validity of a claim, the Court proceeds to the next inquiry—whether the allowance of the claim is equitable.

Section 510(c) of the Bankruptcy Code copies the long-recognized power of bankruptcy courts to subordinate a creditor's claim on equitable grounds under the proper circumstances, and provides in pertinent part:

> ... after notice and a hearing the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of an allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c) (1979). The Bankruptcy Code does not specify the standards for applying the doctrine of equitable subordination, intending to "leave to the courts development of this principle". 124 Cong. Rec. 11 11,095 (Sept. 1978). Congress recognized the need for flexibility in applying the doctrine to enable the courts to appropriately deal with inequitable or fraudulent conduct which may be technically legal and not otherwise voidable. DeNatale & Abram, *supra,* 40 The Business Lawyer at 422.

▪ A party objecting to a claim has the initial burden of presenting a substantial factual basis to overcome the prima facie validity of a proof of claim. *In re Multiponics, Inc.,* 622 F.2d 709, 714 (5th Cir.1980). Once the objecting party has met this initial burden the claimant must then demonstrate the fairness and good faith of the conduct. *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939). Where a claimant is an insider or an affiliate of the debtor, or where the creditor exercises control over or domination of the debtor, his dealings with the debtor are subject to strict scrutiny. *Pep-*

*per v. Litton,* 308 U.S. 295, 306–07, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *In re T.E. Mercer,* 16 B.R. 176 (Bankr.N.D.Tex.1981). The burden is on an insider claimant to show the inherent fairness and good faith of the challenged transaction. *In re Teltronics Services, Inc.,* 29 B.R. 139 (Bankr. D.N.Y.1983). There is no precise definition of domination and control in this context *L. King, 3 Collier On Bankruptcy,* ¶ 510.-05[3][a], at 510–12 (15th ed. Supp.1984).

The Code does define the term "insider":

"(A) if the debtor is an individual—

"(i) relative of the debtor or of a general partner of the debtor;

"(ii) partnership in which the debtor is a general partner;

"(iii) general partner of the debtor; or

"(iv) corporation of which the debtor is a director, officer, or person in control;

"(B) if the debtor is a corporation—

"(i) director of the debtor;

"(ii) officer of the debtor;

"(iii) person in control of the debtor;

"(iv) partnership in which the debtor is a general partner;

"(v) general partner of the debtor; or

"(vi) relative of a general partner, director, officer, or person in control of the debtor;

"(C) if the debtor is a partnership—

"(i) general partner of the debtor;

"(iv) general partner of the debtor; or

"(v) person in control of the debtor'

"(D) if the debtor is a municipality, elected official of the debtor or relative of an elected official of the debtor;

"(E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and

"(F) managing agent of the debtor."

11 U.S.C. § 101(28) (1984). The Code also defines an affiliate as an entity that controls twenty per cent of the debtor' stock, or is controlled by the debtor to the same extent. 11 U.S.C. § 101(2) (1984); *L. King, 3 Collier On Bankruptcy,* ¶ 510.5[3], at 510–12–13 (15th ed. Supp.1984). The court must closely examine the claimant's relationship to the debtor to determine whether the claimant has used an opportunity to adjust its position in such a way that other creditors are prejudiced. *Id.* at 510–13–14. However, the claimant's status as an insider, affiliate or controlling entity will not automatically require subordination. *Id.* To establish that subordination is an appropriate remedy the following elements must be established:

(i) the claimant must have engaged in some type of inequitable conduct;

(ii) the misconduct must have resulted to the creditors of the debtor or conferred an unfair advantage on the claimant;

(iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977).

The courts have recognized at least three general categories of inequitable misconduct warranting equitable subordination: (1) fraud, illegality and breach of fiduciary duties; (2) substitution of debt for capital when a company is undercapitalized; and (3) the claimant's use of the debtor as its alter ego or instrumentality. *See L. King, 3 Collier on Bankruptcy,* ¶ 51005[1], [2], [3], at 510–08–14 (15th ed. Supp.1984). *In re Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 212 (5th Cir.1983). In determining whether the first element is satisfied, the requisite inequitable conduct need not be related to the acquisition of the disputed claim as long as it is directed to the debtor or its creditors. *In re Sepco, Inc.,* 36 B.R. 279, 287 (Bankr.D.S.D.1984) (bank's inequitable conduct consisted of misrepresentation to senior lienholder that execution of document would result in payment where agreement actually contained subordination clause). Proof of outright fraud is unnecessary. "... [the] minimum level of offending conduct appears to be conduct that shocks the conscience of the court." *DeNatale & Abram,* 40 The Business Lawyer, *supra,* at 424.

"Inequitable conduct is conduct which may be lawful, yet shocks one's good conscience ... a secret or open fraud ... an unjust enrichment, not ... by astute-

ness or business acumen, but enrichment through another's loss brought about by one's own unconscionable, unjust, unfair, close or double dealing or foul conduct." *In re Harvest Milling Co.,* 221 F.Supp. 836, 838 (D.Ore.1963). A creditor's unconscionable domination or control to the detriment of other creditors may constitute inequitable conduct. The creditor's relationship to the debtor is important in determining whether his conduct was equitable. Where a creditor has taken control of the debtor, he assumes the fiduciary duties of management and a duty to deal fairly with other creditors. *In re American Lumber Co.,* 5 B.R. 470 (D.Minn.1980). "The creditor's duty of fair dealing is increased in the precise degree that the creditor has power and control over the debtor's affairs." DeNatale & Abram, *supra,* 40 Business Lawyer 424. The Court must scrutinize the creditor's actual use of its control over debtor's operations to determine whether its control constituted inequitable conduct. *In re T.E. Mercer Trucking Co.,* 16 B.R. 176, 190 (Bankr.N.D.Tex.1981); *In re American Lumber Co.,* 5 B.R. 470, 478 (D.Minn.1980).

More than mere pressure or influence on a debtor must be shown. Monitoring operations and proferring advice to a debtor, even coupled with a decision to withhold credit, does not rise to the level of control for the purposes of equitable subordination. *See, e.g., W.T. Grant,* 699 F.2d 599 (2d Cir.1983). "In order to determine whether a creditor has assumed control the court will examine the sum of a creditor's conduct with respect to the debtor, total up all the indicia of control, and determine whether the cumulative conduct has tipped the scales." *DeNatale & Abram,* 40 Business Lawyer *supra,* at 442. Control of a corporation can be established by either stock ownership or the actual exercise of direction, management, or control. *Krivo Indus. Sup. Co. v. Nat's Distill. & Chem. Corp.,* 483 F.2d 1098, 1104 (5th Cir.1973).

The most common type of inequitable conduct is misconduct by insiders or dominating persons in stripping a financially-troubled company of needed capital for personal gain. *In re Rego Crescent Corp.,* 9 B.C.D. 867, 872, 23 B.R. 958 (Bankr.E.D. N.Y.1982). A decision by management to use its undercapitalized, financially-troubled company's funds to acquire property in which its directors have an interest rather than for operations constitutes self-dealing and qualifies as inequitable conduct for the purposes of equitable subordination. *In re Multiponics, Inc.,* 622 F.2d 709, 719 (5th Cir.1980). Intentional nondisclosure of indebtedness may also qualify as inequitable conduct. *E.g., In re Bowman Hardware & Electric Co.,* 67 F.2d 792, 795 (7th Cir.1934). Where a dominant lender makes a loan but delays in perfecting his security interest to conceal the transaction from creditors who continue to do business in reliance on the company's financial condition, the lender's conduct may be considered sharp dealing unfair to creditors. *In re Midtown Produce Terminal, Inc.,* 599 F.2d 389, 394 (10th Cir.1979).

Another type of inequitable conduct which supports equitable subordination is the substitution of debt for capital when the debtor is undercapitalized. *E.g., In re Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980). A claimant in control of an undercapitalized financially-troubled corporation who funds it through debt rather than capital investment deserves subordination because if the loans had been invested in proper form, the investor would not share on a parity with unsecured creditors. *L. King, 3 Collier On Bankruptcy,* ¶ 510.-05[4][a] at 510–16 (15th ed. Supp.1984). Undercapitalization alone, however, is an insufficient given to subordinate the claim of an insider; some inequitable conduct must be shown. *See, e.g., In re N.A.B. Food Services, Inc.,* 32 B.R. 128 (Bankr.S. D.Ohio 1983); *In re Omega Lithographers, Inc.,* 17 B.R. 753 (Bankr.M.D.Pa.1982); *In re Rego Crescent Corp.,* 9 B.C.D. 867, 23 B.R. 958 (Bankr.E.D.N.Y.1982). Here, there was insufficient evidence to find that Gordon's investment of $110,000 constituted inadequate capitalization.

After determining that a claimant is guilty of the requisite inequitable conduct, the court must examine whether the misconduct resulted in harm to other creditors or conferred an unfair advantage on the claimant. *See In re Mobile Steel Co.*, 563 F.2d 692, *700* (5th Cir.1977). "In examining the effect of the conduct on creditors, the court should consider the effect of the then-known creditors, as well as future creditors." *DeNatale & Abram*, 40 Business Lawyer, *supra*, at 426. The type of harm to creditors sufficient for equitable subordination is difficult to define, and depends on the particular facts of the case. Generally, harm would consist of the loss of a right that impacts on the results of the bankruptcy distribution. The misconduct may result in harm to the entire creditor body, a particular class of creditors, to a few or just one creditor. *Id.* at 426. Thus § 510(c) permits the court to establish degrees of subordination. The identity of creditors harmed by the alleged misconduct and damages sustained by each is not necessary for application of equitable subordination. *Cf. In re Trantex Corp.*, 10 B.R. 235, 241 (Bankr.D.Mass.1981).

Harm may consist of a lender's reliance on the management's mischaracterizations of financial condition, *In re Multiponics Inc.*, 622 F.2d 709, 721 (5th Cir.1980) or the continued buildup of unsecured debt caused by the manipulation of the debtor by the claimant to his own advantage. H. Chaitman, *The Equitable Subordination of Bank Claims*, 39 Business Lawyer 1561, 1570 (1985).

The final requirement for equitable subordination is that application of the doctrine to the claim in question will be consistent with bankruptcy law. *In re Multiponics, Inc.*, 622 F.2d 709, 713 (5th Cir. 1980). "... [A]lthough it is a court of equity, ... [the bankruptcy court] ... is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable." *DeNatale & Abram, supra*, at 427–28.

In the present case, the cumulative evidence presents a picture of inequitable self-dealing by M.H. Gordon. At the outset, M.H. Gordon must be held to fiduciary standards towards the debtor because of the control and decision-making authority Ira and Richard Gordon, as principals of M.H. Gordon, exercised over the debtor. Moreover, M.H. Gordon was an insider of the debtor after April 1982 because its owner Ira Gordon, and his son, who I find was his instrumentality, had the power to vote and control more than twenty percent of the stock. The change in attorneys and accountants, the participation in board meetings, as well as their engineering the sales of inferior inventory and of the Narragansett Company, all point to control by the Gordon interests.

The inequitable conduct by Ira and Richard Gordon and M.H. Gordon consisted of the following instances of exploitation of their relationship with the debtor: M.H. Gordon's sale of defective inventory; failure to transfer certain distribution lines; the six month delay in recording and assigning the security agreement; the delayed presentation of the security agreement to the debtor in an unrelated transaction; the sale of Narragansett and related Gordon assets to Beverages; the use of debtor's accountant by M.H. Gordon for several months without compensation; and the payment of employees of a Gordon subsidiary by Beverages when no work was performed for Beverages.

The sale of inventory M.H. Gordon sought to liquidate in the spring of 1982 only benefitted M.H. Gordon and financially harmed the debtor. Although there was no evidence of the value of the goods, there was testimony that many items were unmarketable. The business decision to acquire the liquor inventory would not have been made but for Gordon's new ownership interest in the debtor. In addition, although the April 1982 agreement to buy inventory provided that M.H. Gordon transfer certain distribution lines to Beverages, there was testimony that several lines were

not transferred in accordance with the agreement.

Presentation of the security agreement for execution in December 1982 was also an instance of overreaching. At the closing, many documents were reviewed and executed, and I believe that the Cicerchias did not understand what they were signing. Although they had a responsibility to read the document, the Gordons were deceptive in including this document in a package of unrelated documents at an unrelated closing.

A third instance of inequitable conduct was the delay in obtaining and recording the security interest for the $250,000 loan. Richard Gordon admitted that the purpose of the delay was to encourage third parties to extend credit, which would not be feasible with an outstanding blanket security interest. Moreover, the taking of security interest itself might be considered inequitable in light of the relationship and proximity in time of the sale of inventory and the initial loan. Viewing this as one transaction, the loan was made so that the debtor could buy the inventory. Therefore, $180,000 of the $250,000 went immediately back to M.H. Gordon in exchange for inventory of inferior quality and only $70,000 in cash went to the debtor. For Richard Gordon to take a security interest in all assets of the debtor to secure a $250,000 obligation when the debtor clearly received far less than a $250,000 benefit from the loan was in my view inequitable exploitation of his affiliation. The security transaction between M.H. Gordon and the debtor was also concealed in other ways. In the December 1983 subordination agreement Richard Gordon executed to Mutual Bank, there was no mention that the security interest had been assigned to M.H. Gordon, which was supposed to have occurred one year earlier. In the Treasury Department questionnaire dated June 24, 1982, Richard Gordon stated under the pains and penalties of perjury that the $250,000 advance was an investment of funds by I.B. Gordon, and not a loan.

Another instance of inequitable conduct was the sale of Narragansett by the Gordons to the debtor. In December 1982 the debtor was not in a financial position to expand its operations. The sale was engineered by the Gordon interests for their own benefit. The Gordon attorneys represented both the debtor and Gordon in connection with the sale. There was also evidence that Richard Gordon never contributed his promised investment. After the purchase of NP, the debtor's financial condition worsened.

That M.H. Gordon used Beverages as an instrumentality for its own benefit is evidenced by its causing Beverages to pay the salaries of employees of Consodine Distributing Company, when Beverages received no benefit from the labor of Consodine's employees. Moreover, requiring Beverage's accountant, Mr. Leeds, to work for months at M.H. Gordon's place of business on Gordon projects while being paid by Beverages is further evidence of self-dealing.

As a result of the numerous instances of self-dealing by M.H. Gordon in its relationship with the debtor, unsecured creditors were substantially harmed. The intentional delay in recording the security interest may have enticed creditors to extend credit, when they would not have, had they known about an impending security interest in all assets. Furthermore, both the debtor and creditors were damaged by the sale for full market price of inferior inventory and the over-expansion of debtor's operations by the purchase by the debtor of Narragansett. As a result of these transactions, the financial condition of the debtor plummeted and the assets depleted.

The subordination of M.H. Gordon's claim is not inconsistent with bankruptcy law. M.H. Gordon would not have had a secured claim in the absence of its affiliation with and domination of the debtor. Enforcement of M.H. Gordon's security interest under the circumstances of this case would clearly confer an unfair advantage on M.H. Gordon and prejudice the debtor's unsecured creditors. The cumulative

weight of the evidence has provided a substantial basis to support a finding of impropriety. Accordingly, since the objecting party has sustained its initial burden in objecting to the claim, the claimant's Motion for a directed verdict is denied. In its defense to the challenge of its claim M.H. Gordon presented no evidence showing the good faith or inherent fairness in its dealings with the debtor. Principles of equity would be offended by the allowance of M.H. Gordon's secured claim ahead of or on a parity with unsecured creditors. The Motion for Relief from Stay is denied. Furthermore, in accordance with 11 U.S.C. § 510(c)(1) and (2), the security interest of M.H. Gordon is hereby declared null and void and its claim of $250,000 which shall be reduced by the $28,000 capital contribution which Richard Gordon did not show he actually invested in December 1982, shall be subordinated to the claims of other unsecured creditors.